No. 93,654

Roger Drach, *Appellant,* v. Louis Bruce and State of Kansas, *Appellees.*

(136 P.3d 390)

Opinion filed June 9, 2006.

*Jeremiah J. Kidwell*, of Kansas City, Missouri, argued the cause, and *Dennis J.C. Owens*, of Kansas City, Missouri, was with him on the briefs for appellant.

*Lois K. Malin*, assistant county attorney, argued the cause, and *John P. Wheeler, Jr.*, county attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

DAVIS, J.: Roger Drach's convictions of first-degree premeditated murder, aggravated battery with great bodily harm, and criminal possession of weapons in this marital homicide case were upheld in *State v. Drach*, 268 Kan. 636, 1 P.3d 864 (2000). Drach appeals the denial of his K.S.A. 60-1507 motion alleging that counsel was ineffective by depriving him of the right to testify on his own behalf and that his convictions were based on inadmissible hearsay evidence in violation of the Confrontation Clause. We disagree and affirm.

Roger Drach was convicted of first-degree premeditated murder, aggravated battery with great bodily harm, and criminal possession of weapons in connection with the death of his wife, Deanne Drach. A summary of the facts giving rise to the charges and convictions as set forth in our *State v. Drach*, 268 Kan. 636, decision follows:

"Deanne died on August 19, 1994, as a result of a gunshot wound to the chest. This case was not commenced until nearly 2 years after her death. The main issue at trial was whether Deanne had committed suicide or had been murdered by Drach.

"Drach claimed Deanne committed suicide, that he was not in the room when she was shot, and that he found her on the bed after he heard the shot. The State's expert witnesses testified the wound could not have been self-inflicted. Drach's expert witnesses testified they were 99.5% certain the wound was self-inflicted.

. . . .

"After review of the extensive record (18 volumes, the longest of which is 291 pages), two relevant facts emerged: Deanne had an affair 28 years before her death, and she had been abused since her husband discovered the affair shortly after it occurred.

"At trial, there was much hearsay evidence of abuse suffered throughout the 34-year-marriage, none of which is pinned down by time or date.

"When Deanne's body was examined at the scene, she was on the bed in the southeast corner of the room. The gun that was used to shoot her was in the northwest corner of the room. The gun was a derringer. Both parties' experts

testified the bullet had been fired from the top barrel. Yet, the top barrel had a live round with a dented primer in it and an empty cartridge in the bottom chamber.

"Both old and new blood stains consistent with Deanne's blood were found throughout the house, in Deanne's purse, in her clothing, and in Drach's car, which would indicate Deanne had been abused for a long period of time.

"When Deanne's body was examined, she was lying in fresh blood but had dried blood on her arms and back. She had a 2.5 centimeter laceration on the back of her head that went to the bone, two black eyes, a laceration above the right eye, and bruises all over her body. X-rays revealed new fractures of the 9th, 10th, and 11th ribs.

"Two autopsies revealed old fractures of the 7th, 10th, 11th, and 12th ribs on the right side; a healing fracture of the left ulna; a fracture of the right arm that had recently been refractured; and a gunshot wound to the left arm.

"Drach gave accounts of what happened that did not appear to be accurate. For example, in discussing a broken window, Drach said he had to break into the house because he did not have his key. Law enforcement officers testified the window was broken from the inside out. Drach testified that Deanne had facial bruises when he checked her out of the hospital. Three witnesses testified, however, that Deanne had no visible marks on her when they last saw her, including the discharging nurse at the hospital.

"Drach also said he thought Deanne was drinking again when she died. The autopsy report showed her blood alcohol concentration was .000. Drach also told officers Deanne got her gun out of her car the day she was shot. Her car was in storage at Dodge City at all pertinent times and had been for some time." 268 Kan. at 637-39.

In the original appeal affirming Drach's convictions and sentences, we rejected Drach's argument that the marital discord evidence admitted by the district court as res gestae was inadmissible hearsay because it fell under the marital discord exception. We also concluded that such evidence was not violative of the Confrontation Clause because the statements had particular guarantees of trustworthiness under *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531(1980). 268 Kan. at 648-51.

On October 12, 2004, Drach filed an amended K.S.A. 60-1507 motion claiming that trial counsel was ineffective in failing to inform him of the right to testify on his own behalf and failing to object to prejudicial marital discord testimony. He also claimed that his convictions were based on hearsay testimony which violated the Confrontation Clause under both *Roberts* and *Crawford*

*v. Washington,* 541 U.S. 36, 158 L. Ed. 2d 177, 124 S. Ct. 1354 (2004).

An evidentiary hearing on the motion was held on October 22, 2004. After hearing testimony from Drach and his trial counsel Richard Marquez and John Lindner, the district court denied the motion, finding overwhelming evidence existed that Drach was informed of his right to testify on his own behalf and that his hearsay claims were resolved against him in his direct criminal appeal and are bound by res judicata in his 60-1507 motion. The court further concluded that *Crawford* should not be applied retroactively to cases on collateral review, that the marital discord testimony was not testimonial under *Crawford,* and that *Crawford* does not apply under the doctrine of equitable forfeiture because Drach was responsible for Deanne's death. The defendant timely appealed, and we transferred this case on our own motion pursuant to K.S.A. 20-3018(c).

The defendant raises two arguments on appeal: (1) Defense counsel was ineffective by depriving Drach of the right to testify on his own behalf; and (2) inadmissible hearsay marital discord evidence was admitted at trial in violation of the Confrontation Clause under *Roberts* and *Crawford.*

## K.S.A. 60-1507 Standard of Review

When reviewing the denial of a K.S.A. 60-1507 motion following an evidentiary hearing before the district court, the appellate court reviews the factual underpinnings of the district court's decision by a substantial competent evidence standard and applies a de novo standard when reviewing the district court's decision. The ultimate denial of the 60-1507 motion involves a legal question requiring independent appellate review.

"Substantial evidence is evidence which possesses both relevance and substance and which furnishes a substantial basis of fact from which the issues can reasonably be resolved. [In other words,] substantial evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. [Citation omitted.]" *State v. Luna,* 271 Kan. 573, 574-75, 24 P.3d 125 (2001).

## (1) <u>Sixth Amendment Right to Testify</u>

*Background*

Before the defense rested at trial, Drach had a discussion with his two trial attorneys, Richard Marquez and John Lindner, concerning testifying on his own behalf. The attorneys did not agree whether Drach should testify. Lindner thought the defense did not have "enough" without his testimony, and Marquez was concerned that Drach would lose his temper on the stand and that Drach might have to admit that a battery had occurred. Although Drach made statements that he was paying Marquez to decide if he should testify, both attorneys confirmed that Drach was informed that it was his decision whether to testify and that Drach himself decided that he would not testify. Drach argues that he did not feel like it was his decision to make and the reason why he did not testify was because Marquez did not want him on the stand.

Prior to the State's rebuttal, the district court asked Drach if he understood his Fifth Amendment right against self-incrimination and that it was his decision alone whether to testify on his own behalf. Drach replied that he understood and had decided not to testify. The defense rested without Drach testifying on his own behalf.

During the State's rebuttal, Karen Althaus testified that her husband had an affair with Deanne 25 years earlier. In July 1972, Drach discovered the affair and forced Deanne into the Althauses' home at 1 a.m. Drach was enraged and pointing a gun at a crying Deanne whose clothing was torn. Drach stated that Deanne had confessed to him and he wanted Mr. Althaus to do the same. He made Deanne swear on a Bible to the number of times they had sex, and he struck her across the face demanding to know what happened. Althaus testified that Drach said he had four bullets and that he would kill Deanne and himself because there was no reason to live. He forced Deanne to call her parents, confess her unfaithfulness, and tell them goodbye. He told her parents to drive to Hutchinson to say goodbye to their daughter, and they left the Althaus residence.

At the 60-1507 hearing, Drach testified that he decided he wanted to testify when Althaus was called as a rebuttal witness. He claimed he twice said, " 'Mr. Marquez, she is lying. I've got to testify, I've got to do something.' " Drach said that Marquez waived his hand and said, " 'Sit down, sit down.' " Drach did not testify following rebuttal, nor did he talk to his lawyers about their failure to let him testify or raise the issue with the court.

Marquez testified that he did not remember Drach asking to testify during rebuttal. He did recall that Drach got agitated saying the testimony never happened and Marquez tried to calm him down to prevent the jury from seeing him upset. When Marquez asked Drach about Althaus' testimony, Drach first denied knowing who she was and then said that they were friends. Lindner was on his feet objecting to the rebuttal testimony and did not hear the conversation. Lindner was never aware that day that Drach had expressed a desire to testify.

Subsequently during the jury instruction conference, Drach did not express to the district court that he wished to testify when the district court asked if he would like an instruction concerning his decision not to testify at trial. Instead, Drach requested that such an instruction be given.

*Discussion*

Drach first claims that he was denied his constitutional right to testify on his own behalf through ineffective assistance of counsel. In denying Drach's K.S.A. 60-1507 motion raising this issue, the district court reasoned:

"3. The first claim of the Plaintiff is that he was not informed of his right to make the decision to testify or not, during the trial. The evidence is overwhelming that he was told on numerous times that it was his decision and he chose not to testify.

A. During the Arraignment, the Journal Entry and the statement of Defense Counsel both confirm that Mr. Drach was told that 'He has the right to testify, but only if he/she so desires.'

B. Both defense counsel confirmed that Mr. Drach was told of his right to make the decision and that both stated that it was his decision, after consulting with his attorneys that he would not do so.

C. That at the conclusion of the defense's case, the Court inquired of the Defendant, Mr. Drach, as follows:

'The Court: Mr. Drach, do you understand that you have the Fifth Amendment privilege against self-incrimination, and that's your decision alone whether you wish to testify. And you've made that decision; is that correct sir?

'Roger Drach: Yes, sir.

'The Court: and it's your desire, then not to testify in this matter?

'Roger Drach: Yes sir.' "

"The right to present witnesses to establish a defense is guaranteed under the Sixth Amendment right to compulsory process. It is fundamental to a fair trial, and denial of the right is a denial of due process under the Fourteenth Amendment to the United States Constitution." *State v. Finley*, 268 Kan. 557, Syl. ¶ 1, 998 P.2d 95 (2000). Defendants have a right to testify in their own behalf. *State v. Whitaker*, 260 Kan. 85, 87, 917 P.2d 859 (1996). The "decisions which are to be made by the accused after full consultation with counsel are: (1) what plea to enter; (2) whether to waive jury trial; and (3) whether to testify in his own behalf." *State v. McKinney*, 221 Kan. 691, 694-95, 561 P.2d 432 (1977).

" 'A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.' " *State v. Gleason*, 277 Kan. 624, 643, 88 P.3d 218 (2004) (quoting *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 104 S. Ct. 2052 [1984]).

"Both the performance and prejudice prongs of the ineffective assistance of counsel inquiry are mixed questions of law and fact on appeal requiring de novo review." *State v. Griffin*, 279 Kan. 634, Syl. ¶ 6, 112 P.2d 862 (2005).

Before the district court, Drach argued that he "was never informed by his trial counsel that he had the choice to testify on his own behalf." However, substantial evidence in the record on appeal establishes that Drach was advised of his right to testify at trial and decided to waive that right following full consultation with both

his attorneys and the court before the defense rested. As such, Drach shifts gears and argues that the performance of Drach's counsel was deficient by refusing to allow him to testify freely on his own behalf *on surrebuttal.* Drach contends he could have countered Althaus' detrimental testimony by testifying that he and his wife were best friends with the Althaus couple, that he did not have a gun with him that night, that he never hurt his wife in 1972, that he went to the Althaus residence around 11 p.m., that he did not make the statements relayed by Althaus at trial, and that no violence occurred that night.

The determination of whether Drach asserted his right to testify during rebuttal amounted to a credibility contest between Drach and Marquez. Although the district court did not make specific findings in this regard, the district court's decision that Drach was informed of his right to testify contrary to his allegations otherwise demonstrates that it found Marquez' testimony more credible. See *State v. Combs,* 280 Kan. 45, 50, 118 P.3d 1259 (2005) ("With no objection to inadequate factual findings, the trial court is presumed to have made all necessary factual findings to support its judgment."). The district court was in the better position to weigh the credibility of the witnesses, and this court does not pass on the credibility of witnesses, reweigh conflicting evidence, and questions of credibility are resolved in favor of the State. *State v. Moore,* 269 Kan. 27, 30, 4 P.3d 1141 (2000).

As the appellate court must accept as true the evidence and all inferences drawn from the evidence which tend to support the findings of the trial judge, Drach has not established that counsel's representation was deficient. Even if he had demonstrated a deficiency, Drach has not established prejudice by his inability to personally refute this testimony: Drach had presented 12 witnesses during his case in chief who testified that they had never seen Drach act in a violent manner toward Deanne. Clearly the jury by its verdict believed that Drach had been violent with Deanne.

(2) <u>Admission of Marital Discord Testimony in Violation of the Confrontation Clause</u>

*Background*

In a pretrial hearing, the defense challenged the admission of marital discord testimony on the grounds that it was inadmissible hearsay admitted as res gestae and presented a confrontation issue. The 60-1507 court responded that the Kansas Supreme Court had ruled upon those issues and had carved out a specific exception for marital discord cases. Although a plethora of marital discord evidence was introduced at trial, Drach points to the testimony of Lana Christensen, Carol Taylor, Janet Meyers, Marvelle Darough, Marvelle Sosa, and Dora Hermosillo as the hearsay witnesses in his K.S.A. 60-1507 motion. We summarized this evidence in the direct appeal as follows:

"Approximately 2 months before her death, Deanne went to St. Catherine's Hospital in Garden City. Deanne was inebriated, barefoot, not wearing her broken glasses, and her hair was in disarray. Drach was arrested for domestic battery. Deanne told Family Crisis Services workers [Christensen & Taylor] who testified at trial, that Drach had threatened her life. They also testified that Deanne had related to them that Drach had often beat her over the years and had repeatedly threatened her life over an affair that she had over 25 years previous. Deanne also reported to the workers that she had suffered broken ribs and arms over the years. Deanne further told the workers that she had been shot in the shoulder by Drach on a previous occasion. The workers observed a scar on Deanne's shoulder. Deanne told the workers that Drach had forbid her from seeking medical attention for most of these injuries.

"Deanne related the same facts to a counselor in Dodge City [Hermosillo] who testified at trial. The counselor testified that Deanne had told her about times when Drach hit her in the face, stomach, and arms.

"Approximately 1 month before her death, Deanne was admitted to St. Joseph's Hospital in Wichita. A doctor [Meyers] testified that he noticed scars about her face and arms. Deanne told him that Drach had caused the scars." 268 Kan. at 648.

Additionally, Dr. Meyers referred Deanne to Marvelle Darrough, a therapist who testified at trial that she had learned of the spousal abuse while working with Deanne. Deanne described horrific beatings, being repeatedly threatened with a gun, and being burned with an iron. Darrough diagnosed her with battered woman syndrome with trauma syndrome. Marvelle Sosa, an addictions counselor with the hospital, testified that she remembered Deanne because she had endured a lot of "awesome" spousal abuse.

In the direct appeal, Drach argued that evidence of Deanne's statements about spousal abuse she had suffered at the hands of Drach constituted inadmissible hearsay and prior bad acts. We found that although the trial court had admitted the evidence on the grounds of res gestae, Kansas courts had consistently admitted evidence of marital discord even though it may fall under the traditional notion of hearsay or prior bad acts. We further noted that hearsay statements made by a deceased spouse declarant are admissible as evidence of marital discord if the trial court finds that the statements have particular guarantees of trustworthiness under *Roberts*. Finally, we found that the question of whether the admission of the evidence as res gestae violated the Confrontation Clause was moot because the evidence was admissible under the marital discord exception. 268 Kan. at 650-51.

In his K.S.A. 60-1507 motion, Drach argued the marital discord testimony presented by the above six witnesses admitted at trial was inadmissible hearsay which violated the Confrontation Clause under both *Roberts* and *Crawford*. The 60-1507 court ruled in relevant part:

"7. The fifth issue raised was the claim that the hearsay evidence presented by the six listed witnesses should not have been presented under the guidelines set out in *Crawford v. Washington*, 541 U.S. [36], 158 L. Ed. 2d 177, 124 S. Ct. [1354 (2004)]. The hearsay nature of the testimony was dealt with on direct appeal to the Supreme Court of Kansas and found to be acceptable as set out in that opinion. That opinion was not appealed further.

. . . .

"9. Where Mrs. Drach is unable to take the stand and be cross-examined, supposedly because she was dead at the hands of Roger Drach, such an equitable forfeiture of the Confrontation Clause is found to be proper. Under that evaluation, the reliance on the *Crawford* case would not be justified.

. . . .

"2. The hearsay nature of the testimony of Lana Christensen, Carol Taylor, Janet Meyers, Marvelle Darough, Marvelle Sosa and Dora Hermosillo was raised on direct appeal and the Supreme Court of Kansas found that such testimony was proper. The objection on hearsay testimony is by its nature, an objection on the basis of the right to confront one's accuser. To that extent, the Court finds that res judicata should apply to this argument. If the Supreme Court chooses to use the petition under K.S.A. 60-1507 as the vehicle to reverse itself, this Court feels it has the power to do so. Until then, this Court rules that the application must fail due to the fact that it has already been ruled on.

"3. The State argues that Mr. Drach failed to preserve the Confrontation Clause as a basis for the original appeal. This Court disagrees and rules that the issue was originally preserved and ruled on by the Supreme Court.

"4. The State further argues that *Crawford* should **not** be applied retroactively. This Court agrees that it should not, and that based upon *Brown v. Uphoff*, 381 F.3d 1219 (1st Cir. N.H.) August 19, 2004, and other reasoned authority, the decision of *Crawford* should NOT be retroactively applied.

"5. The *Crawford* case applies only to evidence that is testimonial in nature. Under the definitions as applied in *Evans v. Luebbers*, 371 F.3d 438 (8th Cir. MO) June 10, 2004, the testimony of the [six] witnesses complained of by Mr. Drach would not be deemed testimonial in nature and therefore not excluded under the ruling of the *Crawford* case."

*Discussion*

"The Sixth Amendment to the United States Constitution provides that in all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him or her. This constitutional provision does not preclude the admission of all out-of-court statements. In determining the admissibility of hearsay exceptions, the court must also consider the requirements of the Confrontation Clause of the United States Constitution. The Confrontation Clause can operate to bar the admission of evidence that would otherwise be admissible under an exception to the hearsay rule if confrontation requirements are not met." *State v. Lackey*, 280 Kan. 190, Syl. ¶ 1, 120 P.3d 332 (2005), *cert. denied* 126 S. Ct. 1653 (2006).

At the time of trial in this case, a Confrontation Clause analysis was based on the United States Supreme Court's decision in *Roberts*. This court described the *Roberts* analysis in *State v. Bailey*, 263 Kan. 685, 692-93, 952 P.2d 1289 (1998) (quoting *Bratt*, 250 Kan. 264, Syl. ¶ 1, 824 P.2d 983 [1992]):

" 'The Confrontation Clause operates in two ways when determining the admissibility of hearsay statements. First, the Sixth Amendment establishes a rule of necessity. In the usual case, the prosecution must either produce or demonstrate the unavailability of the declarant whose statement it wishes to use against the defendant. Second, once a witness is shown to be unavailable, the witness' statement is admissible only if it bears adequate indicia of reliability. Reliability can be inferred where the evidence falls within a firmly rooted hearsay exception. If the evidence does not fall within a firmly rooted hearsay exception, the evidence must be excluded absent a showing of particularized guarantees of trustworthiness.' (Emphasis added.)" 263 Kan. at 692-93.

However, after the direct appeal in this case, the United States Supreme Court in *Crawford* substantially altered the Confronta-

tion Clause analysis expressed in *Bailey* and *Roberts*. See *State v. Meeks*, 277 Kan. 609, 613-14, 88 P.3d 789 (2004). In *Crawford*, the Court drew distinctions between testimonial and nontestimonial hearsay evidence, holding:

"Where nontestimonial hearsay is at issue, it is wholly consistent with the Framers' [constitutional] design to afford the States flexibility in their development of hearsay law—as does *Roberts*, and as would an approach that exempted such statements from Confrontation Clause scrutiny altogether. Where testimonial evidence is at issue, however, the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination. We leave for another day any effort to spell out a comprehensive definition of 'testimonial.' Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a formal trial; and to police interrogations." 541 U.S. at 68.

Drach argues on appeal that the marital discord evidence should not have been admitted as res gestae or under the judicially created marital discord exception. He contends the admission of this hearsay evidence violated his rights under the Confrontation Clause under both *Roberts* and *Crawford*. The State offers several alternative arguments in response: (1) res judicata applies as this argument was raised on direct appeal; (2) *Crawford* is not retroactively applied in collateral appeals; (3) the marital discord testimony was not testimonial under *Crawford*; (4) Drach has forfeited his right to confrontation by killing the victim; (5) the erroneous admission of this evidence under *Crawford* was harmless error. The State's first two arguments resolve this case, although we consider them in reverse order.

### Retroactivity of *Crawford v. Washington*

As discussed above, the United States Supreme Court concluded in *Crawford* that *Roberts* should no longer be used when conducting a Confrontation Clause analysis concerning testimonial hearsay. While the Kansas appellate courts have applied *Crawford* to cases pending on direct appeal, we have yet to consider whether it applies to collateral proceedings. See, *e.g.*, *State v. Corbett*, 281 Kan. 294, 303-04, 130 P.3d 1179 (2006) (applying *Crawford* on direct appeal); *Payton v. State*, No, 92,435, unpublished opinion filed December 9, 2005, *rev. denied* 281 Kan. 1378 (2006) (panel

did not reach retroactivity of *Crawford* where conviction would be upheld regardless of whether *Crawford* applied).

The State argues that *Crawford* does not apply retroactively to collateral proceedings. Contrary to Drach's assertions on appeal, the 60-1507 court in this case agreed with the State: "The State further argues that *Crawford* should not be applied retroactively. This Court agrees that it should not, and that based upon *Brown v. Uphoff*, 381 F.3d 1219 ([10th Cir.]) August 19, 2004, and other reasoned authority, the decision of *Crawford* should NOT be retroactively applied."

In *Gaudina v. State*, 278 Kan. 103, 105, 92 P.3d 574 (2004), we set forth the following analysis to be used in determining whether a change in the law should be applied retroactively in collateral proceedings:

"Kansas appellate courts have applied a three-step analysis for determining whether a change in the law should be applied retroactively in a criminal case under collateral attack. First, the court must determine whether the movant has properly raised the issue in his or her collateral attack. Supreme Court Rule 183(c) limits the issues that may be raised in a collateral attack. . . . Second, the court determines whether the case was final when the new law was established. . . . If a case was final when the new law was established, the general rule is that the new law will not be applied to cases on collateral attack. [Citation omitted.] Third, if the case was final before the new law was established, the court must determine whether any exception to the general rule against retroactive application applies."

In this case, the question of whether *Crawford* applies retroactively is properly brought in a K.S.A. 60-1507 motion and the *Crawford* opinion filed in 2004 was clearly decided well after the direct appeal was final in 2000. As such, we turn our attention to whether any exception to the general rule against retroactive application applies.

"Under *Teague v. Lane*, 489 U.S. 288, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989), a new rule of constitutional criminal procedure is not applied retroactively on collateral review unless (1) it places certain kinds of primary, private individual conduct beyond the power of the criminal law-making authority to prosecute, or (2) it is a watershed rule requiring the observance of those procedures that are implicit in the concept of ordered liberty." *Whisler v. State*, 272 Kan. 864, Syl. ¶1, 36 P.3d 290 (2001), *cert. denied* 535 U.S. 1066 (2002).

In this case, Drach's argument focuses on whether *Crawford* should be applied retroactively under the second *Teague* exception.

In *Schriro v. Summerlin*, 542 U.S. 348, 352, 159 L. Ed. 2d 442, 124 S. Ct. 2519 (2004), the United States Supreme Court further provided:

"New rules of procedure, on the other hand, generally do not apply retroactively. They do not produce a class of persons convicted of conduct the law does not make criminal, but merely raise the possibility that someone convicted with use of the invalidated procedure might have been acquitted otherwise. Because of this more speculative connection to innocence, we give retroactive effect to only a small set of ' "watershed rules of criminal procedure" implicating the fundamental fairness and accuracy of the criminal proceeding.' *Saffle, supra,* at 495 (quoting *Teague,* 489 U.S., at 311 (plurality opinion)). *That a new procedural rule is 'fundamental' in some abstract sense is not enough; the rule must be one 'without which the likelihood of an accurate conviction is seriously diminished.' Id.,* at 313 (emphasis added). *This class of rules is extremely narrow, and 'it is unlikely that any . . . "ha[s] yet to emerge." ' Tyler v. Cain,* 533 U.S. 656, 667, n.7 (2001) (quoting *Sawyer v. Smith,* 497 U.S. 227, 243 [1990])." (Emphasis added.)

The United States Supreme Court has thus established a strict standard for whether a new rule meets the second *Teague* exception; the emphasized statements above in *Summerlin* suggests that it does not consider the previously decided *Crawford* decision to fall within this exception. Nevertheless, in *Bockting v. Bayer,* 399 F.3d 1010 (9th Cir. 2005), the sole case relied upon by Drach, the Ninth Circuit applied *Summerlin* and concluded that *Crawford* was retroactive, reasoning in part:

"Thus, at the heart of the Court's concerns in *Crawford* was the reliability of admitted evidence. Where admitted evidence is unreliable, the accuracy of convictions is seriously undermined. That the rule in *Crawford* is one without which the accuracy of convictions would be seriously undermined is further born out by the Court's own description of its prior doctrine as a 'rare case' of 'fundamental failure.' *Id,* at 1373. The difference between pre-and post-*Crawford* Confrontation Clause jurisprudence is not the sort of change that can be dismissed as merely incremental. Instead, it is an 'absolute pre-requisite to fundamental fairness.' *Sawyer,* 497 U.S. at 244." *Bockting,* 399 F.3d at 1018-19.

In contrast, the great weight of the authority that has considered *Teague* and/or *Summerlin* has concluded that *Crawford* is not retroactive to collateral appeals. In *Brown v. Uphoff,* 381 F.3d 1219, 1226-27 (10th Cir. 2004), the Tenth Circuit found:

"Whether the rule of *Crawford* should be retroactively applied, therefore, depends on whether it meets one of the two exceptions articulated by the Court in *Teague.* Clearly, the first exception does not apply because *Crawford* does not place private conduct beyond the power of law-making authority to proscribe. We must examine then whether *Crawford* set forth a 'watershed rule' of criminal procedure. As we have noted before, this exception is narrowly defined. *Johnson v. McKune*, 288 F.3d 1187, 1197-98 (10th Cir. 2002). 'To qualify as a "watershed" rule of criminal procedure, the rule must not only improve the accuracy with which defendants are convicted or acquitted, but also alter our understanding of the *bedrock procedural elements* essential to the fairness of a proceeding.' *Mora*, 293 F.3d at 1218-19 (quotation omitted). We conclude that the rule in *Crawford* does not meet this definition.

"It is true that in *Crawford* the Court referred to the protections of the Confrontation Clause as a 'bedrock procedural guarantee,' *Crawford*, 541 U.S. at 42, 124 S. Ct. at 1359, but that comment does not necessarily suggest that the rule set forth in *Crawford* is 'on the magnitude of the rule announced in *Gideon v. Wainwright*' as it must be to fit within the *Teague* exception. *See Mora*, 293 F.3d at 1219. Unlike *Gideon, Crawford* does not 'alter [ ] our understanding of what constitutes basic due process,' *Mora*, 293 F.3d at 1219, but merely sets out new standards for the admission of certain kinds of hearsay. Confrontation Clause violations are subject to harmless error analysis and thus may be excused depending on the state of the evidence at trial. *Crespin v. New Mexico*, 144 F.3d 641, 649 (1998). It would, therefore, be difficult to conclude that the rule in *Crawford* alters rights fundamental to due process. *See Mora*, 293 F.3d at 1219 (holding that *Apprendi v. New Jersey* did not alter fundamental due process rights, in part because *Apprendi* errors could be excused given overwhelming evidence). Accordingly, we conclude that *Crawford* is not a watershed decision and is, therefore, not retroactively applicable to Brown's initial habeas petition."

Several other circuits have rejected the argument that the accuracy of the convictions is seriously diminished by the failure to apply *Crawford*. For example, in *Mungo v. Duncan*, 393 F.3d 327, 335-36 (2d Cir. 2004), the Second Circuit held:

"Assuming that *Crawford* announced a new rule, the question of its retroactivity turns, for our purposes, on whether the rule is necessary to the fundamental fairness, and improves the accuracy, of criminal proceedings. *Teague*, 489 U.S. at 311-14, 109 S. Ct. 1060. We do not believe that *Crawford* necessarily improves the overall accuracy of the criminal process. As we see the operation of the *Crawford* rule, it is likely to improve accuracy in some circumstances and diminish it in others. To the extent that *Crawford* requires the exclusion of unreliable hearsay that would have been admitted under the prior law, it is likely to improve accuracy. As the *Crawford* Court noted, courts applying *Roberts* were required to make 'amorphous' determinations whether hearsay statements bore 'particularized guar-

antees of trustworthiness,' and inevitably received unreliable evidence on that basis on some occasions. *Crawford*, 124 S. Ct. at 1370-72. Further, as Judge Weinstein observed below, not all hearsay statements that fit within firmly established exceptions to the hearsay rule are necessarily reliable. *Mungo*, 277 F. Supp. 2d at 184-85. Because *Crawford* bars the admission of testimonial statements that would have been countenanced by the old rules, and because some such evidence is unreliable, *Crawford* will in those instances improve the accuracy of the process.

"At the same time, however, *Crawford* also precludes admission of highly reliable testimonial out-of-court statements that would have been admissible under the old rules. In such instances, juries will be deprived of highly reliable evidence of guilt, and cases that otherwise would have resulted in well-deserved convictions will now result in acquittals or hung juries. We recognize that *Crawford*'s rule derives from the principle that cross-examination is a better engine of truth-determination than a judge's assessment of the reliability of uncross-examined hearsay. *Crawford*, 124 S. Ct. at 1370. We do not question this principle. But it does not necessarily follow that the *Crawford* rule will improve the accuracy of the process. For the requirement of cross-examination will, in cases where the declarant is not available to be called for cross-examination, simply result in the exclusion of the testimony altogether. Where the testimony was admissible under the old rules precisely because it was reliable, these applications of *Crawford* will diminish, rather than increase, the accuracy of the process.

"[T]he advent of the *Crawford* rule brings about substantial changes in the protection given by the Confrontation Clause to an accused from receipt of uncross-examined statements. In some instances those changes will likely improve the accuracy of the factfinding process; in others they will likely impair the accuracy of the factfinding process. Because *Teague*'s test of a watershed rule requires improvement in the accuracy of the trial process overall, we conclude that *Crawford* is not a watershed rule."

Likewise in *Lave v. Dretke*, 444 F.3d 333 (5th Cir. 2006), the Fifth Circuit found the rule announced in *Crawford* does not implicate the fundamental fairness and accuracy of criminal proceedings reasoning:

"Lave's argument [that the *Crawford* rule improves the accuracy of criminal proceedings because it excludes custodial statements by alleged accomplices unless the defendant has had a prior opportunity to cross-examine that alleged accomplice], however, does not show that the *Roberts* regime 'so seriously diminishe[d] accuracy that there [was] an impermissibly large risk of punishing conduct the law does not reach.' *Summerlin*, 542 U.S. at 355-56, 124 S. Ct. 2519 (internal quotations and citations omitted). Out-of-court testimonial statements were not indiscriminately presented to juries under the *Roberts* regime. Indeed, they were inadmissible unless they bore adequate 'indicia of reliability.' *Roberts*, 448 U.S. at 66, 100 S. Ct. 2531. Because only those statements that were deemed reliable

could be admitted under *Roberts,* the fact that the class of statements as a whole is suspect does not demonstrate that *Roberts* created an impermissible risk of false conviction.

"By its own terms, *Crawford* does not purport to announce a rule that increases the reliability of trial testimony. The opinion states, 'the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.' 541 U.S. at 61, 124 S. Ct. 1354.

"As other circuits have held, the rule announced in *Crawford* does not assure greater accuracy because it bars admission of a statement to which it applies even when the statement is highly reliable. . . .

"The rule announced in *Crawford* does not implicate the fundamental fairness and accuracy of criminal proceedings. While it may implicate the core of the confrontation right, it is not a rule without which there is an impermissibly high risk of false conviction." 444 F.3d at 335-36.

Additionally, the First, Sixth, Seventh, Eighth, and Eleventh Circuits have also either held or suggested that *Crawford* should not be applied retroactively. See *Espy v. Massac,* 443 F.3d 1362, 1367 (11th Cir. 2006) ("Although the rule announced in *Crawford* also impacts the accuracy of criminal convictions, it does not qualify as a 'watershed' rule in the mold of *Gideon. Crawford* merely altered the existing regime outlined by *White,* 502 U.S. at 355-56, 112 S. Ct. at 742-43, and *Roberts,* 448 U.S. at 65, 100 S. Ct. at 2539."); *Murillo v. Frank,* 402 F.3d 786, 790-91 (7th Cir. 2005) ("The point of *Crawford* is not that only live testimony is reliable, but that the sixth amendment gives the accused a right to insist on live testimony, whether that demand promotes or frustrates accuracy. . . . This is not an indispensable innocence-protecting decision that must be applied retroactively to criminal prosecutions that have already been finally resolved on direct review."); *Dorchy v. Jones,* 398 F.3d 783, 788 (6th Cir. 2005) ("Under most circumstances, however, newly promulgated rules of criminal procedure do not apply retroactively to cases on collateral review. . . . *Teague* thus prohibits Dorchy from availing himself of the new rule articulated in *Crawford.*"); *Evans v. Luebbers,* 371 F.3d 438, 444 (8th Cir. 2004) ("[T]he *Crawford* Court did not suggest that this doctrine would apply retroactively and the doctrine itself does not appear to fall within either of the two narrow

exceptions to *Teague v. Lane's* non-retroactivity doctrine."); *McGonagle v. United States*, 137 Fed. Appx. 373, 380 (1st Cir. 2005) (unpublished opinion) ("It is doubtful that *Crawford* applies retroactively to cases on collateral review.").

For a number of reasons, we agree with the majority of the circuit courts which have considered this issue. First, the general rule is that a new law established after a case is final will not be applied to cases on collateral attack. *Gaudina*, 278 Kan. at 105. Second, we view the United States Supreme Court's statement in *Summerlin* after *Crawford* was decided as strongly suggesting that the *Crawford* decision does not fall under the second *Teague* exception: "This class of rules is extremely narrow, and *'it is unlikely that any . . . "ha[s] yet to emerge.'* " [Citations omitted.]" (Emphasis added.) 542 U.S. at 352.

Third, the United States Supreme Court has repeatedly declined invitations to treat one or another decision as a "watershed rule." For example, *Summerlin*, 542 U.S. 348, holds that *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000), is not retroactive on collateral attack, and we agree with the Seventh Circuit's observation that *Apprendi* is "surely a more sweeping change than *Crawford* (and more important to defendants, too, because it entitles them to a jury decision, while *Crawford* affects only what evidence the jury hears)." *Murillo v. Frank*, 402 F.3d 786, 790 (7th Cir. 2005). We have likewise found that *Apprendi* is not a watershed rule of criminal procedure that implicates the fundamental fairness of trial. See *Whisler*, 272 Kan. at 879.

Finally, the above case law persuasively demonstrates that *Crawford* is not a watershed rule of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding. Although the Ninth Circuit questioned the reliability and accuracy of the conviction prior to *Crawford*, the other circuits persuasively point out that reliability of the evidence in either *Roberts* or *Crawford* is simply tested in different ways, *i.e.*, by a finding that the evidence bore an "adequate indicia of reliability" or by opportunity for cross-examination. While application of *Crawford* may improve the accuracy of convictions in some instances by providing the opportunity to cross-examine a witness, *Crawford* might diminish the

accuracy of a conviction in the case where evidence is highly reliable but excluded because it was not subject to cross-examination. For all of the above reasons, we conclude that *Crawford*'s new rule is not a watershed rule entitled to retroactive application. Thus, Drach's remaining arguments applying the *Crawford* analysis are moot.

### Res Judicata/*Roberts*

As *Crawford* is not retroactively applicable to Drach's case on collateral review, Drach alternatively argues that the marital discord evidence in this case was inadmissible hearsay. He contends the admission of this evidence as either res gestae or under the judicially created marital discord hearsay exception violated the Confrontation Clause under the law in effect at the time of trial, *Ohio v. Roberts*, 448 U.S. 56.

In this 60-1507 motion, Drach raises the exact same issue that was resolved by this court on his direct appeal.

On direct appeal, Drach raised the following issue:

"Drach argues [in his direct appeal] that evidence of his prior bad acts was erroneously admitted at trial. This evidence consisted of statements Deanne made to others about beatings she had suffered at the hands of Drach and also testimony from others who saw bruises and cuts on Deanne. Drach argues that Deanne's statements were inadmissible hearsay and that the other testimony was inadmissible evidence of prior bad acts." 268 Kan. at 648.

We rejected his argument, reasoning:

"Although the trial court admitted the evidence on the basis of res gestae, the evidence was admissible on other independent grounds. Kansas courts have consistently allowed evidence of 'marital discord' in cases similar to this. Evidence of marital discord can include several types of evidence: Oral and written statements made by the deceased spouse relating their abuse; evidence of scarring, bruising, bleeding, and other physical manifestations of the abuse; testimony by others who saw the couple fighting, arguing, or otherwise in conflict; and statements by the defendant relating that he or she will kill his or her spouse. This testimony may fall under the traditional notion of hearsay or evidence of prior bad acts, yet still be admitted." 268 Kan. at 648-49.

After citing numerous marital discord cases which allowed marital discord evidence independent of the "prior bad acts" exclusion or a "hearsay" exclusion, we concluded:

"Hearsay statements made by a deceased spouse-declarant are admissible as evidence of marital discord if the trial court finds that the statements have particular guarantees of trustworthiness. See *Ohio v. Roberts*, 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531 (1980).

. . . .

"Drach argues res gestae evidence is violative of the Confrontation Clause of the United States Constitution. The evidence complained of is admissible under the marital discord exception. Drach's argument under this issue is moot. The evidence was admissible, and the trial court did not abuse its discretion in allowing the evidence of marital discord." 268 Kan. at 651.

Based upon our resolution of this issue on Drach's direct appeal, the State argues that the doctrine of res judicata applies to the same issue Drach now raises in his 60-1507 motion:

"Under Kansas law, where an appeal is taken from the sentence imposed and/ or a conviction, the judgment of the reviewing court is res judicata as to all issues actually raised, and those issues that could have been presented, but were not presented, are deemed waived. Where a defendant's claim has not been raised at trial or on direct appeal, such a default prevents the defendant from raising the claim in a second appeal or a collateral proceeding." *State v. Neer*, 247 Kan. 137, 140-41, 795 P.2d 362 (1990).

Drach does not dispute that the issue of whether the hearsay was improper under *Roberts* was decided by the court on direct appeal. Rather, Drach seeks to have this court revisit the issue by suggesting in his brief that the "law of the case" doctrine rather than res judicata should apply: Under this doctrine, issues already decided by this Court on appeal "should not be relitigated or reconsidered unless [they are] clearly erroneous or would cause manifest injustice." *State v. Collier*, 263 Kan. 629, Syl. ¶ 3, 952 P.2d 1326 (1998). Drach argues that this court's decision on direct appeal was clearly erroneous and imposed a manifest injustice on him.

The problem with Drach's argument is that he omits a critical portion of the "law of the case" doctrine in his argument:

"When a second appeal is brought to this court *in the same case*, the first decision is the settled law of the case on all questions involved in the first appeal, and reconsideration will not normally be given to such questions. Ordinarily, under the law of the case doctrine, once an issue is decided by the court, it should not be relitigated or reconsidered unless it is clearly erroneous or would cause manifest injustice." (Emphasis added.) *Collier*, 263 Kan. 629, Syl. ¶ 3.

See also *In re Cullen,* No, 91,735, unpublished opinion filed December 17, 2004 (law of the case doctrine not applicable to same issues raised in the second separate case).

The law of the case doctrine is thus inapplicable to this case where the appeal stems from a K.S.A. 60-1507 civil proceeding, which is a separate case from the criminal proceedings considered by this court on direct appeal in 2000. Drach raised virtually identical arguments in his direct appeal, and he has not shown why any of his new arguments concerning hearsay or *Roberts* could not have been raised on direct appeal. See Supreme Court Rule 183(c)(3) (2005 Kan. Ct. R. Annot. 228) (a K.S.A. 60-1507 motion cannot be used as a substitute for a second appeal, absent a showing the trial error affected constitutional rights and a showing of exceptional circumstances). In fact, Justice Six referenced the marital discord exemption law review article in his concurring opinion that Drach now relies upon in his hearsay argument in this appeal. 268 Kan. at 651-52. Although Drach now claims that the district court never found on the record that the statements carried with them a particularized degree of trustworthiness under *Roberts*, the trial court is presumed to have made all necessary factual findings to support its judgment in the absence of an objection to inadequate findings. *State v. Combs,* 280 Kan. 45, 50, 118 P.3d 1259 (2005).

### Conclusion

We conclude that the factual underpinnings of the district court's decision are supported by substantial competent evidence. Based upon our independent appellate review of the district court's denial of Drach's K.S.A. 60-1507 motion, we further conclude that the order of denial was legally correct and supported by the district court's factual findings. We therefore affirm the decision of the district court. Our decision renders Drach's remaining arguments moot.

Affirmed.