No. 89,706

STATE OF KANSAS, *Appellee*, v. BOVI L. COMBS, *Appellant.*

(118 P.3d 1259)

Opinion filed September 9, 2005.

*Steven B. Chapman*, of Chapman & White, LLC, of Olathe, argued the cause and was on the brief for appellant.

*Sheryl L. Lidtke*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Phill Kline*, attorney general, were with her on the brief for appellee.

*Per Curiam*: This is Bovi L. Combs' direct appeal from his jury convictions of first-degree murder, conspiracy to commit murder, and kidnapping.

As there are no issues raised regarding the sufficiency of the evidence, we will summarize the facts of the crimes but discuss in detail the interrogation of Combs, which is the basis for his principal argument on appeal. This is a companion case to *State v. Jackson*, 280 Kan. 16, 118 P.3d 1238 (2005), which contains a more complete factual statement.

On June 4, 2001, Combs, Shecora Clanton, and Andrew Jackson drove a U-Haul truck Clanton had rented using Combs' money to the home of Delesha Williams in Kansas City, Missouri. Combs believed Williams had been involved in the death of his sister and planned to kill her and steal her big screen television and other furniture.

Combs and Clanton had previously befriended Williams. They, along with Jackson, were allowed to enter Williams' home, where

they ate and watched television. Williams went to bed, telling Combs and his friends they could spend the night if they wished.

Shortly thereafter, Combs and Jackson attacked Williams, hitting her with a rubber mallet, attempting to poison her with chemicals in a syringe, choking and beating her, attempting to strangle her with an extension cord, and stabbing her with two knives. After Williams appeared to be dead, she was loaded into the U-Haul along with a big screen television, two other smaller televisions, a vacuum cleaner, a videocassette recorder, a tool box, and some telephones.

While driving the U-Haul after letting Jackson off, Clanton and Combs heard Williams scream. They decided to take Williams to a wooded area in Kansas City, Kansas, to run over and dump her body. Combs heard Williams wheezing as he placed her body lengthwise under the rear tires of the U-Haul. Combs drove over Williams' body four times, hit her in the head with a log, and dragged her body down a hill into the woods.

Dr. Donald Pojman, who performed the autopsy on the victim, testified that despite the many injuries, Williams' death was caused by the crushing injuries to the chest and abdomen resulting from being run over by the U-Haul truck.

Combs and Clanton were arrested within hours of the murder by Kansas City, Missouri, police, who were investigating a burglary and missing person report from Williams' godmother. Later that day, while Combs was being interrogated, Kansas City, Kansas, police discovered Williams' body.

There was overwhelming evidence of Combs' involvement in Williams' death, including DNA evidence showing the victim's blood on Combs' pants, shoe, and jacket and on a knife found in Combs' possession. Combs' footprints were identified from bloody prints found inside Williams' house and muddy prints found inside the U-Haul. The police found a backpack inside Clanton's house containing some of the stolen property from Williams' home. Clanton testified against Combs at his trial.

Combs testified at trial, placing the blame for Williams' death on Jackson and Clanton. Combs contended Williams had died in Missouri and denied criminal actions.

The Kansas jury convicted Combs of first-degree murder, conspiracy to commit murder, and kidnapping. He was sentenced to the "hard 50" life sentence plus 59 months. Our jurisdiction for his appeal is pursuant to K.S.A. 22-3601.

Combs' primary argument on appeal is that the trial court erroneously admitted his confession. He first argues the confession was obtained without proper *Miranda* warnings or access to an attorney. His second contention is that the actions of Detective Bell resulted in his confession being involuntary. He contends the trial court erred in overruling his motion to suppress and in allowing his videotaped statement to be shown to the jury.

An appellate court reviews the district court's decision regarding the suppression of a confession using a dual standard. The factual findings are reviewed using a substantial competent evidence standard. An appellate court will not reweigh the evidence and will give deference to the trial court's factual findings. The ultimate legal conclusion drawn from the trial court's factual findings is a question of law which is reviewed de novo. *State v. White*, 275 Kan. 580, 596-97, 67 P.3d 138 (2003). An appellate court accepts as true the evidence and all inferences drawn therefrom that support the trial court's findings. *State v. Speed*, 265 Kan. 26, 36-37, 961 P.2d 13 (1998).

To determine whether a confession is voluntary, a court must look at the totality of the circumstances in considering the following factors: the duration and manner of the interrogation; the ability of the accused to communicate on request with the outside world; the age, intellect, and background of the accused; and the fairness of the officers in conducting the investigation. The key inquiry is whether the statement is a product of the accused's free and independent will. *White*, 275 Kan. at 597. Coercion in obtaining a confession can be mental or physical. *State v. Waugh*, 238 Kan. 537, 541, 712 P.2d 1243 (1986).

The statutory basis for the admission of a defendant's confession is set forth under one of the specific exceptions to the hearsay rule in K.S.A. 2004 Supp. 60-460(f), which states:

"Evidence of a statement which is made other than by a witness while testifying at the hearing, offered to prove the truth of the matter stated, is hearsay evidence and inadmissible except:

. . . .

"(f) *Confessions.* In a criminal proceeding as against the accused, a previous statement by the accused relative to the offense charged, but only if the judge finds that the accused (1) when making the statement was conscious and was capable of understanding what the accused said and did and (2) was not induced to make the statement (A) under compulsion or by infliction or threats of infliction of suffering upon the accused or another, or by prolonged interrogation under such circumstances as to render the statement involuntary or (B) by threats or promises concerning action to be taken by a public official with reference to the crime, likely to cause the accused to make such a statement falsely, and made by a person whom the accused reasonably believed to have the power or authority to execute the same."

In discussing the necessity of advising an accused of his or her constitutional rights, we have said:

"The Fifth Amendment to the United States Constitution guarantees the right against self-incrimination, including the right to have a lawyer present during custodial interrogation and the right to remain silent. *Miranda v. Arizona,* 384 U.S. 436, 479, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). The United States Supreme Court and this court have recognized that these rights are ' "sufficiently important to suspects in criminal investigations" ' to require that any waiver of the right be knowing and intelligent. [Citations omitted.] If a suspect knowingly and intelligently waives these rights, law enforcement officers are free to ask questions. [Citation omitted.]" *State v. Walker,* 276 Kan. 939, 944, 80 P.3d 1132 (2003).

At the time the motions to suppress and to determine the admissibility of statements were filed, Combs, Clanton, and Jackson were charged in the same information. After hearing evidence regarding the statements of both Combs and Jackson, Judge J. Dexter Burdette of the Wyandotte County District Court issued the following memorandum opinion:

"Based upon the totality of the circumstances and evidence presented in court, it is the opinion of this Court that the State may use both defendants' statements in their case in chief. It is the opinion of the Court that both statements were voluntarily and knowingly given without any fraud, duress or coercion. This Court considered the defendants' mental condition, the manner and length of the questioning, the ability of the defendants to cease and desist at any time and their ability to communicate with anyone else, their age, background and responses to the questions asked and the demeanor and fairness of the officers conducting the interrogation.

"This Court could find no coercion or attempt to undermine the defendants' ability to exercise free will.

"Further, it was not crucial that the officers had focused their suspicions upon the defendants. The *Miranda* warnings were administered once the focus shifted from questioning a witness to gather information to placing restrictions on the defendants' freedom so as to render them in custody."

Combs first argues his confession was obtained without proper *Miranda* warnings because he was not *Mirandized* immediately when Detective Bell began to ask him questions. Combs first testified he received his *Miranda* warnings after the interrogation and immediately before being taken into another room to record his statement using a video camera. He later testified the warnings were not given until after he had made a video statement but admitted on cross-examination the video showed the signed *Miranda* waiver in his hands during his statement. He said he signed the waiver of rights form without reading it or having it read to him. This testimony was directly contradicted by Detective Bell, and the trial court, by its ruling, clearly resolved this conflict against Combs.

Detective Bell testified he gave Combs his *Miranda* warnings at 1:21 p.m., approximately 2 hours after Combs arrived at the police station for questioning. When Combs arrived, all that had been reported was a burglary and that Williams was missing. Detective Bell testified he spoke with Combs for about an hour during the initial 2-hour period, asking preliminary biographical questions such as phone number, address, work, education, and identifying marks, among others. Detective Bell attempted to build rapport with Combs by talking about Combs' nickname, "New York," and Combs' relation to rap singer Sean Combs.

After the preliminary information form was completed, Detective Bell testified he stepped out of the interview room and talked to other officers who were interviewing Clanton. Based on Clanton's statements, Detective Bell concluded Combs may have been involved in Williams' disappearance, so he gave Combs the *Miranda* warnings. Detective Bell testified Combs was not handcuffed when he initially came to the interview room and would have been free to go "at that point."

The trial court's finding that Detective Bell gave Combs the *Miranda* warnings when the focus of the questioning shifted from gathering general information is supported by Detective Bell's tes-

timony. Although the testimonies of Detective Bell and Combs were conflicting, an appellate court will not reweigh the evidence or pass on the credibility of witnesses. See *State v. Jones*, 267 Kan. 627, 640, 984 P.2d 132 (1999) (finding substantial competent evidence to support the voluntariness of defendant's statement following the trial court's finding that the defendant's testimony lacked credibility). This is a classic case of a trial court's resolution of conflicting evidence. The trial court's finding that Combs was properly provided with *Miranda* warnings is supported by substantial competent evidence, and such a finding will not be overturned by this court. See *White*, 275 Kan. at 596.

As part of his *Miranda* argument, Combs contends his Fifth Amendment rights were violated because Detective Bell refused to stop interrogating him and provide an attorney when he requested one. Combs testified that he requested an attorney. Detective Bell testified Combs never requested an attorney at any time during the interrogation.

The trial court's denial of Combs' motion to suppress indicates it did not believe Comb's testimony regarding his request for an attorney. With no objection to inadequate factual findings, the trial court is presumed to have made all necessary factual findings to support its judgment. *Gilkey v. State*, 31 Kan. App. 2d 77, 77-78, 60 P.3d 351, *rev. denied* 275 Kan. 963 (2003). Detective Bell's testimony is substantial competent evidence to support the trial court's implied finding. Such implied findings regarding the lack of an attorney request and supported by substantial competent evidence will not be overturned on appeal. See *Hill v. Farm Bur. Mut. Ins. Co.*, 263 Kan. 703, 706, 952 P.2d 1286 (1998).

Combs next attacks the admission of his confession, claiming it was involuntary due to Detective Bell's threats and promises. Combs' principal argument that his confession was involuntary involves his contentions that Detective Bell physically threatened him with choking and head-butting. The videotape was reviewed by the court and the jury, and it was clear Combs was at times irritating and difficult. As to Combs' complaint concerning the comment by Detective Bell about choking him, Combs admitted in his own testimony that it was made in the hallway after the

videotaped statement had been completed. Clearly, this statement, made to another law enforcement officer, could not have had any effect on Combs' earlier statement and the interrogations.

However, Combs testified the statement about being head-butted occurred when he first met Detective Bell. This testimony is directly contradicted by Detective Bell's testimony that he did become frustrated after several hours of interrogation and admitted he may have made a statement to Combs that he could head-butt him. There is no evidence that he did commit the act of head-butting. The trial judge hearing the motion to suppress did not make a specific finding concerning this allegation, but the conclusion that the confession was voluntary carries with it the implication that Combs was not adversely affected by Detective Bell's frustration. The trial court heard the witnesses and evaluated their credibility, and we find no reversible error.

Combs further complains Detective Bell's statement that he could receive the death penalty was a coercive threat. Combs claims the implication of this statement was that he could avoid the death penalty if he said what Detective Bell wanted to hear. Detective Bell admitted that after Williams' body had been found, he may have told Combs that he could be facing the death penalty, but such a statement was only an attempt to get Combs to be truthful with him. We have declined to find a confession to be involuntary when the police encourage a defendant to tell the truth. *State v. Newfield,* 229 Kan. 347, 359, 623 P.2d 1349 (1981).

Detective Bell admitted he told Combs that only he could "help" him but said this came in response to a rambling statement by Combs about praying to God and Jesus, and Detective Bell said, "[N]either God or Jesus can help . . . I was the one that could help him." Detective Bell denied making deals with Combs or promising leniency and said he told Combs that "truth and honesty from him would be better than—than the lies that he was providing at that point." None of this conversation or these statements negatively impact the findings of voluntariness of Combs' confession. See *Waugh,* 238 Kan. at 540-41.

Our evaluation of the voluntariness of Combs' confession requires us to look at the totality of the circumstances using the factors we have previously set forth. See *White,* 275 Kan. at 597.

We first look at the duration and manner of the interrogation and find it was not excessive or improper considering all the facts and circumstances. Discussion of the crime did not commence until after 1:30 p.m. Detective Bell left the room numerous times because information was constantly being received from Clanton's interrogation. Once Williams' body was discovered, the seriousness of the charges escalated.

The evidence showed Clanton's videotaped statement was taken about 6 p.m., and Detective Bell was involved there and not questioning Combs in that time frame. There were two crime scenes; over 350 exhibits were ultimately admitted in the trial of the case. Combs' statement followed Clanton's and began about 7:45 p.m. and ended around 8:45 p.m.

Combs complained the interview room was purposely cold, but Detective Bell testified the police station is an old building, making regulation of temperature difficult. Combs was offered food but only requested and received two cups of water. Combs was not handcuffed or shackled during the interrogation and was allowed to take breaks to use the bathroom. The duration of Combs' interrogation was not excessive. See *State v. Brown*, 258 Kan. 374, 394-95, 904 P.2d 985 (1995).

Combs does not claim he was denied the right to outside communication except for his claim that he was not allowed access to an attorney. This contention was factually resolved against him in the trial court's findings on the motion to suppress. The trial court's finding that Combs was not denied access to an attorney was supported by substantial competent evidence. The factor of outside communications does not weigh in favor of finding the confession to be involuntary.

Combs makes no effective argument that his confession was involuntary because of his age or a mental defect, such as inexperience with police investigations. The record reflects these factors did not negatively affect the finding of voluntariness. Combs was 29 years old when interrogated and had been convicted of five previous felonies in Missouri, showing he was familiar with the criminal justice system. He made no claim to be under any disability. These factors do not support his claim of involuntariness.

The trial court did not find the officers to be unfair in conducting the interrogation. It was acknowledged by the trial court that Detective Bell did become frustrated and angry with Combs but concluded the behavior was not threatening. An interrogation in a murder investigation is not a social event, and we follow the trial court's findings and conclude Combs' confession was not involuntary.

There was other evidence to support the conclusion that Combs' statement to Detective Bell was voluntary. During a break in the interrogation, Combs wrote a note to Clanton. Police discovered the note before the videotaped statement began. The note was on a piece of paper that had been torn into pieces and thrown into the trash can in the interrogation room. In the note, Combs asked Clanton to tell the truth and told her he had told the police the "truth." He specifically wrote, "I've told Brian everything I could possibly think of."

We hold there was substantial evidence to support the trial court's findings of voluntariness. The trial court resolved all of the disputed evidence, and we accept the trial court's findings on those matters. We do not endorse all of Detective Bell's actions, but applying the required factors and looking at the totality of the circumstances, we affirm the findings and conclusion that Combs' confession was voluntarily given. We also point out that the substantial and overwhelming evidence substantiating the convictions is consistent with and follows the statements given by Combs in his confession. This issue is clearly not one which justifies reversal of the trial court's rulings.

Combs' second argument, that the trial court erroneously instructed the jury on the presumption of death having occurred in Kansas, is without merit.

The instruction in issue provides:

"A person is subject to prosecution and punishment under the law of this state if he commits a crime wholly or partly within this state.

"An offense is committed partly within this state if either an act which is a constituent and material element of the offense, or the proximate result of such act, occurs within the state. If the body of a homicide victim is found within the state, the death is presumed to have occurred within the state.

"It is not a defense that the defendant's conduct is also a crime under the laws of another state or of the United States or of another country."

Combs objected to the last sentence of the second paragraph concerning death being presumed to have occurred where the body was found. When the objection was overruled, Combs asked that additional language be added stating the presumption could be overcome by evidence. This was also denied, and the instruction was given as above set forth.

Combs argues the instruction violates his right to due process because it allows the jury to find him guilty without requiring the State to prove every element of the crime beyond a reasonable doubt.

An appellate court reviews a challenged jury instruction by considering all of the instructions together without isolating any one instruction. If the instructions, read as a whole, properly and fairly state the law as applied to the facts of the case and a jury could not reasonably be misled by them, then the instructions do not constitute reversible error even if they are in some small way erroneous. *State v. Peterson*, 273 Kan. 217, 221, 42 P.3d 137 (2002).

This issue has been previously resolved against Combs' contentions. In both *State v. Martin*, 241 Kan. 732, 742-43, 740 P.2d 577 (1987), and *State v. Johnson*, 222 Kan. 465, 475-76, 565 P.2d 993 (1977), we addressed whether it was error to instruct the jury that "[i]f the body of a homicide victim is found within the state, the death is presumed to have occurred within the state." Noting that the language of the instruction is derived from K.S.A. 21-3104, the *Martin* and *Johnson* courts held that the instruction is proper when read in conjunction with the elements instruction, which includes a requirement that the act occurred in Kansas. *Martin*, 241 Kan. at 742-43; *Johnson*, 222 Kan. at 475-76. Combs fails to distinguish either of these cases.

More importantly, the evidence clearly does not support Combs' argument that Williams died before her body was dumped in Kansas. The deputy coroner, who performed an autopsy on Williams, testified that Williams died from crushing injuries to her torso as a result of being run over by a vehicle. The coroner also testified

that Williams was alive when she was run over. Clanton testified that she heard Williams scream in the back of the truck, so they decided to go to a wooded area in Kansas to run over Williams and dump her body. Even Combs said in his videotaped statement that he heard Williams wheezing when he removed her body from the U-Haul in Kansas.

The instruction was proper and followed K.S.A. 21-3104. The evidence clearly showed Williams was killed in Kansas. This issue has no merit.

The convictions and sentences are affirmed.

GERNON, J., not participating.