(247 P.3d 1074)
No. 102,390

STATE OF KANSAS, *Appellee*, v. ERNEST L. REED, *Appellant*.

Opinion filed February 18, 2011.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Jeffery B. Ebel*, assistant county attorney, *Ellen H. Mitchell*, county attorney, and *Steve Six*, attorney general, for appellee.

Before BUSER, P.J., STANDRIDGE, J., and BUKATY, S.J.

STANDRIDGE, J.: Ernest L. Reed appeals from his convictions of aggravated robbery, aggravated assault, and obstruction of official duty. Reed argues the district court erred in failing to suppress the eyewitness identification of him, in denying his request for a unanimity jury instruction, and in giving a deadlocked jury instruction prior to deliberations. For the reasons stated below, we affirm.

## FACTS

On October 17, 2008, Michael Orabuena went by himself to see a movie at the Central Mall in Salina, Kansas. The movie ended at about 11:30 p.m. Unable to find a ride home, Orabuena called his mother on a cell phone. As he began walking back toward the mall, two men assaulted and robbed Orabuena at gunpoint. The men got away with a Bic lighter, a $10 bill, and six $1 bills, all of which they forcibly removed from Orabuena's pocket.

Orabuena called 911 to report the incident. As he was telling the police what happened, he observed the men walk away and eventually meet up with two other people. Orabuena continued to watch the men until he could no longer see them, after which he went to the mall as instructed by the police.

At 11:53 p.m., Officer Aaron Carswell of the Salina Police Department was dispatched to investigate a report of armed robbery at the Central Mall. He was advised to look for several people crossing Ninth Street westbound from the mall. As he approached the area, he saw four people crossing Ninth Street. He pulled his marked vehicle in front of the individuals so he could talk to them. As he stepped out of the vehicle, one of the individuals began to

run. Carswell yelled for him to stop, but the individual failed to do so. Carswell, accompanied by his police dog and two other officers who had just arrived at the scene, chased the individual on foot. Although Carswell and Officer Michael Kohman briefly lost sight of the individual during the chase, the individual eventually was apprehended by Officer Paul Forrester. The individual was identified as Reed and placed in the back of a patrol car as a suspect.

When he was arrested, Reed had in his possession one $10 bill and seven $1 bills. Reed did not have a lighter or a gun in his possession, and none of the officers who participated in the chase saw Reed drop anything as he was running. Officer Carswell conducted a brief search of the area around the mall where the robbery occurred to no avail. Officer Kohman similarly failed to discover anything in a cursory search of the route he had taken in his attempt to apprehend Reed. The officers did not conduct a search of the route used by Reed to flee the scene.

Upon meeting up with Orabuena at the mall, an officer asked him if he was willing to look at a suspect the police had taken into custody to determine whether he could identify the suspect as one of his assailants. After agreeing to do so, Orabuena was escorted to the police car to see if he recognized Reed, who was sitting in the back seat of the patrol car wearing handcuffs. Orabuena identified Reed as the person who robbed him. Two days later, a small silver gun was found in the yard of an apartment complex near where Reed had run.

Reed was charged with one count each of aggravated robbery, aggravated battery, aggravated assault, and obstructing official duty. Prior to trial, Reed filed a motion to suppress all testimony and evidence related to Orabuena's identification of him. In support of this motion, Reed claimed the identification procedure employed by law enforcement—a one-person show-up—was unnecessarily suggestive and created a substantial likelihood of irreparable misidentification.

At the suppression hearing, Officer Breanna Buechman testified that Reed was transported in her patrol car to the mall where Orabuena was waiting. Buechman " 'asked [Orabuena] if he would be willing to look at the subject [she] had in [her] car and see if he

could ID him or not.' " Orabuena agreed, so Officer Buechman rolled down the back window on the side of the car where Orabuena was standing and turned on the lights inside her patrol car. Orabuena remained outside of the police car, and Reed remained seated in the police car wearing handcuffs. Officer Buechman testified that Orabuena " 'positively identified [Reed] as the person that pulled the handgun on him and that had pistol-whipped him.' "

Orabuena testified that he was talking to his mother on a cell phone while walking toward the mall when he heard a noise from behind that prompted him to turn around and notice that two black males were running toward him. Because the men were a "good distance" away when he first noticed them, Orabuena continued to walk toward the mall but stepped off the path into the grass hoping the men would run by him. As the men drew near, he told his mom to hold on. A split second later, one of the men hit him in the back of the head with a pistol. Orabuena turned around and saw one of the men pointing a gun at him. He had never had a gun pointed at him before. Orabuena described the gun as a little silver pistol. As he looked at it, one of the men told him to turn back around. After he turned away, one of the men asked, " 'Where's the shit' "? Because Orabuena understood this to be a question asking where he kept his money, he responded that it was in his pocket. Orabuena had $16 in his pocket—a $10 bill and six $1 bills. He also had a Bic lighter. After reaching into Orabuena's pocket and taking both his money and his lighter, one of the men hit Orabuena a second time with the pistol and then hit him again in the head with a fist. The men then stepped back, and one man pointed the gun at Orabuena's head and told him to start running or they were going to shoot him. Orabuena just stared at the men and eventually walked away. The actual robbery took about 2 to 3 minutes.

When Orabuena called 911, he described the men only as two black males. At the suppression hearing, however, Orabuena testified that both his assailants were wearing dark-colored clothing and hoodie sweatshirts. He further testified that one of the men had a "dark figure" on the cheek. It is not clear from the record whether this description was ever attributed to Reed.

According to Orabuena, a police officer had him look at someone in a patrol car and asked him to identify the man and determine if he was the person who robbed him. Orabuena testified that he did not feel any pressure to identify the suspect in the car as the person who robbed him. Orabuena looked at the suspect through the car window and was about an arm's length away at the time of the identification. Orabuena was standing outside the car, and the suspect in the car was in the back seat facing forward. Orabuena did not think the car's dome light was on at the time. Orabuena looked at the suspect for about a minute before identifying the man as the person who robbed him. Orabuena testified that he had no doubt that the man in the car was the person who robbed him. Although not realizing it until he arrived home, Orabuena also testified that the man he identified had been sitting two seats down to his left during the movie.

Orabuena testified he had not used any alcohol or drugs that evening. His only disability was that he was legally blind in his right eye, but he had perfect vision in his left eye. Orabuena did not regularly see an eye doctor, but he had been to an eye doctor sometime around the beginning of 2008. During the robbery, Orabuena turned his head left to look at the assailants. Orabuena acknowledged that he was "pretty mad" at the time he made the identification. He further acknowledged that he wanted to help the police find whoever committed the robbery, and he wanted his money back.

After considering all of the evidence presented, the district court denied the motion to suppress. In so doing, the court acknowledged the suggestive nature of an identification process where the suspect is placed in the back seat of a patrol car wearing handcuffs when identified. Evaluating the reliability of this identification process in the context of the circumstances presented here, the district judge stated:

"The Court notes that Mr. Orabuena testified that he observed the defendant at the movie earlier that evening; that Mr. Orabuena [sic] was sitting a couple of seats down to his left. The Court would note that that was the eye in which Mr. Orabuena has perfect vision, rather than his right eye, in which he is legally blind.

"He also observed the defendant at the scene of the incident, where there was some light from the mall parking lot shining into that area; also had the chance to look at the person he identified as that person was walking away with three other persons, while he was calling 911.

"Mr. Orabuena testified that he was more stunned than scared at the time the incident happened, and the Court listened very carefully to Mr. Orabuena's tone of voice and demeanor as evidenced by his voice during the 911 call, and it struck the Court Mr. Orabuena appeared very calm as he was relaying the information to the dispatcher on the 911 call. There was a lot of shouting, very excited utterances. He was very calm, relating the facts of the situation to the dispatcher and where the people were.

"Looking at the logs that were presented by Lieutenant Pruitt, [the custodian of the records for 911 calls and dispatch logs,] the identification would have occurred within roughly about a half an hour or so after this incident occurred, so it was very contemporaneous in time.

"Mr. Orabuena's identifications have remained consistent throughout. He gave a positive identification at the car, indicated that he was sure of it. That was testified to both by Mr. Orabuena and Officer Buechman.

"And given the consistency and positive identification and the earlier other opportunities he had to observe this defendant, the Court is going to deny the suppression motion.

"Obviously, the eyewitness identification instruction may be given at trial, but the Court finds that it is not so unnecessarily suggestive or that the identification was so indefinite that suppression would be warranted in this case, so I will deny the motion to suppress the identification."

The case proceeded to trial, during which defense counsel objected to the admission of Orabuena's testimony regarding his identification of Reed after the robbery. The objection was overruled. While testifying at trial, Orabuena was asked if the person who robbed him was in the room and, if so, if he could identify him. Defense counsel objected to the in-court identification, but this objection was overruled as well. Orabuena identified Reed as the person who robbed him.

The jury ultimately returned a verdict of guilty on the charges of aggravated robbery, aggravated assault, and obstruction.

## ANALYSIS

Reed presents the following issues for decision in this appeal: (1) whether the district court erred in failing to suppress the eyewitness identification of him; (2) whether the district court erred

in denying his request for a unanimity jury instruction; and (3) whether the district court erred in giving a deadlocked jury instruction prior to deliberations. We address each issue in turn.

*Motion to Suppress*

A review of the decision to deny a motion to suppress eyewitness identification involves a mixed question of fact and law. The factual basis for the district court's decision to deny such a motion and permit introduction of eyewitness identification evidence is reviewed using a substantial competent evidence standard. *State v. Corbett*, 281 Kan. 294, 304, 130 P.3d 1179 (2006). Substantial evidence is defined as "such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion." *State v. Luna*, 271 Kan. 573, 575, 24 P.3d 125 (2001). In reviewing for substantial evidence, this court does not reweigh the evidence or pass on the credibility of witnesses. See *State v. Combs*, 280 Kan. 45, 50, 118 P.3d 1259 (2005). The ultimate legal conclusion that the eyewitness identification is admissible in light of the factual findings is reviewed de novo. *Corbett*, 281 Kan. at 304.

A two-step analysis is used to determine admissibility of eyewitness identification. First, the court determines whether the procedure used for making the identification was impermissibly suggestive. If so, the second step requires an analysis of whether the impermissibly suggestive procedure led to a substantial likelihood of misidentification. The sole purpose of this second step is to assess reliability of the identification. *Corbett*, 281 Kan. at 304. This assessment must be made in light of the totality of the circumstances surrounding the identification, circumstances which have been held to include:

"1. The witness' opportunity to view the criminal at the time of the crime;
"2. The witness' degree of attention;
"3. The accuracy of the witness' prior description;
"4. The level of certainty demonstrated by the witness at the confrontation;
"5. The length of time between the crime and the confrontation;
"6. The witness' capacity to observe the event, including his or her mental and physical acuity;
"7. The spontaneity and consistency of the witness' identification and the susceptibility to suggestion; and

"8. The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly." *Corbett*, 281 Kan. at 304-05 (citing *State v. Hunt*, 275 Kan. 811, 817-18, 69 P.3d 571 [2003]).

Before we apply this two-part test to the facts here, we believe it noteworthy to point out that although Reed claims the process used to identify him was *unnecessarily* suggestive and led to a substantial likelihood of misidentification, the standard most recently set forth by our Supreme Court considers whether the procedure used for making the identification was *impermissibly* suggestive and led to a substantial likelihood of misidentification. See *Corbett*, 281 Kan. at 304.

Upon review of the line of cases leading up to the decision in *Corbett*, however, we find the appellate courts in Kansas often use the terms "unnecessarily suggestive" and "impermissibly suggestive" interchangeably. Although we believe a literal interpretation of the term "impermissibly suggestive" is a conclusive finding about the legality of the procedure, the *Corbett* court uses this standard of suggestiveness as only the beginning of its inquiry, not its end. Specifically, the *Corbett* test requires such a finding before the analysis can proceed to the second step for a determination regarding whether the "impermissibly suggestive" procedure was reliable in light of the totality of the circumstances. See 281 Kan. at 304-06.

Significantly, use of "unnecessarily suggestive" as a standard appears to derive from the analysis conducted by appellate courts in Kansas that recognize time is often crucial when there is an eyewitness who can identify a suspect and delay in identification could impede the police investigation. *State v. Alires*, 246 Kan. 635, 640, 792 P.2d 1019 (1990) (citing *State v. Meeks*, 205 Kan. 261, 266, 469 P.2d 302 [1970]). A literal interpretation of the term "unnecessarily suggestive" is consistent with this analysis, which requires the court to decide whether exigent circumstances necessitated the more suggestive procedure as opposed to use of an alternative procedure that was less suggestive. Notably, a finding that less suggestive procedures could have been used does not render the more suggestive procedure unreliable as a matter of law. Such a finding

means only that the court is obliged to move on to the second part of the analysis. See *Corbett*, 281 Kan. at 304.

Based on the discussion above, we will use the term "unnecessarily suggestive" in this opinion so that we can more accurately describe the standard for admissibility of eyewitness identification used by our Supreme Court in *Corbett*. Given this clarification, we move on to the substance of our analysis.

*Step 1: Was the identification procedure unnecessarily suggestive?*

As a preliminary matter, we note there may be some confusion regarding the decision of the district court with regard to this first step in the analysis. Based on our review of the transcript documenting the court's ruling, we believe the court found the identification procedure used in this case was unnecessarily suggestive. To that end, the district court acknowledged at the outset that "whenever we have one of these identifications where the defendant is sitting in the police car, obviously, we have a heightened sense of unnecessarily suggestive identifications." In light of this situation, the court then proceeded to what appears to be step 2 of the analysis by evaluating the totality of the circumstances surrounding the identification in order to assess the reliability of the outcome. Although acknowledging for a second time the unnecessarily suggestive nature of the identification procedure used here, the court ultimately concluded that the totality of the circumstances surrounding the procedure effectively offset the suggestion that Orabuena's identification was unreliable because it was made when Reed was sitting in the back of a patrol car wearing handcuffs. Finding the procedure to be sufficiently reliable, the district court denied Reed's motion to suppress the identification.

Given that the district court repeatedly acknowledged the identification procedure used in this case was unnecessarily suggestive in nature, and the court's deliberate evaluation of the totality of the circumstances surrounding the identification for purposes of assessing reliability, it is reasonable to conclude that the district court made an affirmative finding in step 1 of the test that the

identification procedure used in this case was unnecessarily suggestive. For the reasons stated below, we affirm this finding.

This court has not favored show-up identifications absent exigent circumstances. *State v. Lawson*, 25 Kan. App. 2d 138, Syl. ¶ 3, 959 P.2d 923 (1998). "The problems inherent in any identification procedure are compounded when that procedure is a 'show-up.' A 'show up' is essentially one person, almost always is in custody, sometimes in handcuffs, being identified by an individual who usually was a victim of a crime a short time before the identification." *Hunt*, 275 Kan. at 815.

Nevertheless, Kansas courts have "approved one-on-one confrontations shortly after the commission of an offense, recognizing that time is crucial when there is an eyewitness who can identify a suspect and that any delay in identification could impede the police investigation." *Alires*, 246 Kan. at 640 (quoting *Meeks*, 205 Kan. at 266).

Notwithstanding the time pressures and risk of delay associated with eyewitness identification, the procedure used to identify Reed in this case was unnecessarily suggestive. When Orabuena called 911, he reported only that the men who assaulted him were "two black males." After reporting the assault, Orabuena was instructed by the police to meet them at the mall. Upon meeting at the mall, the officer communicated to Orabuena that they had taken a suspect into custody and asked Orabuena if he was willing to look at the suspect to see if he could identify the man as one of his assailants. After agreeing to do so, Orabuena was escorted to the police car to see if he recognized Reed, a lone person sitting in the back seat of the marked patrol car wearing handcuffs. The record contains no facts to explain why Orabuena was requested to identify Reed at the mall under these suggestive circumstances instead of at the police station, where the identification undoubtedly could have proceeded under less suggestive circumstances.

Simply put, in this case there is substantial competent evidence to support the district court's finding that the procedure used to identify Reed was unnecessarily suggestive; thus, we will proceed to the second step in the prescribed analysis.

*Step 2: Did the unnecessarily suggestive procedure lead to a sub-stantial likelihood of misidentification rendering the identifica-tion unreliable?*

The second step of the eyewitness identification analysis requires us to consider what are generally referred to as the *"Hunt"* relia-bility factors. See *Corbett*, 281 Kan. at 304-05; *Hunt*, 275 Kan. at 817-18. We review the facts associated with each of these factors in turn.

*The witness' opportunity to view the criminal at the time of the crime*: The robbery took place shortly before midnight near the mall parking lot. There were some lights coming from the parking lot, but Orabuena stated it was "kind of dark." Orabuena first viewed the men who robbed him as they were running toward him. They were a "good distance" away and Orabuena was talking on the phone, so he did not pay much attention to them. The robbery lasted 2 to 3 minutes, but Orabuena had his back to the robbers most of that time. The first time he turned toward them, he saw one of the robbers "[f]or a split second." Although Orabuena turned around again, he remained focused on the gun pointed at him. Orabuena did, however, watch the robbers as they walked away and the mall overhead lights were on at that time.

*The witness' degree of attention*: Although talking on his cell phone prior to being attacked, Orabuena detected the men from a distance as they were running toward him. Once they ap-proached, Orabuena noticed a dark figure on the side of one man's face. He observed that both men had on dark clothing and hoodie sweatshirts. Orabuena attentively watched the robbers the entire time he was on the phone with the 911 dispatcher and saw the men meet up with two other people. After listening to the 911 tape, the district court noted Orabuena was very calm when he relayed information to the emergency dispatcher, and that finding is supported by the record.

*The accuracy of the witness' prior description*: The only physical description Orabuena gave to the 911 dispatcher was that the two men were black. The officer who was dispatched to search for the robbers initially was told only that he was looking for four black

individuals. But because Orabuena continued to observe the robbers walking while he was on the phone with the dispatcher, Orabuena was able to pinpoint the exact location of the four black individuals for the officers as they arrived on the scene. Notably, four of the officers who were dispatched to the designated location were able to independently verify that four black individuals were walking at the precise location described by Orabuena. Each of these four officers further verified that one of these four individuals took off running after they arrived. That individual was arrested and subsequently identified as Reed.

*The level of certainty demonstrated by the witness at the confrontation*: Orabuena testified that at the time he identified Reed, he had no doubt Reed was the person who robbed him. According to the officer who observed Orabuena's identification, Orabuena positively identified Reed as the person who pulled a handgun on him and pistol-whipped him.

*The length of time between the crime and the confrontation*: The identification occurred within a half hour of the robbery.

*The witness' capacity to observe the event, including his or her mental and physical acuity*: Orabuena affirmatively testified that he had not used drugs, alcohol, or any medications that would have affected his ability to concentrate or report the incident. Orabuena was legally blind in one eye, but he had perfect vision in the other eye. Although Orabuena had been hit twice in the head with a gun and once with a fist, he presented himself as coherent and rational during the 911 call as he relayed information to the emergency dispatcher.

*The spontaneity and consistency of the witness' identification and the susceptibility to suggestion*: Orabuena stated that during the identification procedure, he did not feel any pressure to identify the individual in the patrol car as the person who robbed him. Orabuena testified that he had no doubt the man in the back seat of the patrol car was the person who robbed him, and his testimony is consistent with the identification he made at both the preliminary hearing and trial. Officer Buechman testified Orabuena decisively identified Reed as the individual who robbed him and never wavered from this position.

*The nature of the event being observed and the likelihood that the witness would perceive, remember, and relate it correctly*: Reed alleges Orabuena was " 'stunned' " after the encounter, which would necessarily result in a significant risk that Orabuena inaccurately perceived the encounter as it transpired, inaccurately remembered the encounter after the fact, and inaccurately reported the encounter to the authorities. We find no evidence to support this allegation and therefore will not consider it as part of our analysis.

Having considered each of the *Hunt* reliability factors in the context of the totality of the circumstances surrounding the identification procedure used in this case, we find the possibility of misidentification to be highly unlikely. Although Orabuena's failure to sufficiently describe more than a few of his assailant's physical characteristics may, in and of itself, appear contrary to a finding of reliability, we find it extraordinarily significant that Orabuena never lost sight of the two robbers as they walked away and met up with two other individuals, he stayed on the line with the dispatcher to provide status reports regarding the robbers' current location as they walked, and he ultimately pinpointed the exact location of the four black individuals for the officers as they arrived on the scene. We find that Orabuena's identification to be reliable and therefore affirm the district court's decision to deny Reed's motion to suppress it.

*Unanimity Instruction*

Reed argues the district court erred in denying his request for a unanimity instruction on the aggravated robbery charge because the State alleged multiple acts (robbery by threat of bodily harm and robbery by force) to support the charge. The State argues this is an alternative means case that does not require a unanimity instruction because either a finding of threat by bodily harm or a finding of force is sufficient to support the charge.

The Kansas Supreme Court recently clarified the difference between an alternative means case and a multiple acts case:

" ' "In an alternative means case, where a single offense may be committed in more than one way, there must be jury unanimity as to *guilt* for the single crime

charged. Unanimity is not required, however, as to the *means* by which the crime was committed so long as substantial evidence supports each alternative means. [Citations omitted.] In reviewing an alternative means case, the court must determine whether a rational trier of fact *could* have found each means of committing the crime proved beyond a reasonable doubt. [Citations omitted.]

' "In multiple acts cases, on the other hand, several acts are alleged and any one of them could constitute the crime charged. In these cases, the jury must be unanimous as to which act or incident constitutes the crime. To ensure jury unanimity in multiple acts cases, we require that either the State elect the particular criminal act upon which it will rely for conviction, or that the trial court instruct the jury that all of them must agree that the same underlying criminal act has been proved beyond a reasonable doubt. [Citations omitted.]" ' " *State v. Becker*, 290 Kan. 842, 854-55, 235 P.3d 424 (2010).

This is an alternative means case. Reed was charged with one count of aggravated robbery, which could have been committed by either a threat of bodily harm or by force. "In an alternative means case the jury must be unanimous as to guilt for the single crime charged, but need not be unanimous as to the particular means by which the crime was committed, so long as substantial evidence supports each alternative means. [Citation omitted.]" *Becker*, 290 Kan. at 855. Therefore, we must determine whether there was substantial evidence from which a jury could have concluded beyond a reasonable doubt that (1) Reed committed robbery by threat of bodily harm and (2) Reed committed robbery by force.

There was evidence in this case that two men approached Orabuena and hit him in the back of the head with a gun. Orabuena turned and saw one of the men pointing a gun at him. The man told Orabuena to turn around and said, " 'Shut up. Where's the shit.' " Orabuena thought the man wanted to know where his money was, so he said it was in his pocket. One of the men reached into Orabuena's pocket and took Orabuena's money and a lighter. The man then hit Orabuena again with the gun and with a fist. The men then stepped back, and one man pointed the gun at Orabuena and told him to run or they would shoot him.

We find sufficient evidence of robbery by force in that money was retrieved from Orabuena's pocket after he was hit in the head. We find sufficient evidence of robbery by threat of bodily harm in that the money was retrieved from Orabuena's pocket as his as-

sailant was pointing a gun at him. See *State v. Calvin*, 279 Kan. 193, 200, 105 P.3d 710 (2005) (finding that pointing gun at victim was threat of bodily harm and, under facts of that case, was sufficient evidence to prove attempted robbery). Because there was sufficient evidence to support each alternative means of committing aggravated robbery, a unanimity instruction was not required, and the district court did not err in failing to give it.

## Allen-*type Instruction*

Reed argues the district court erred in giving an *Allen*-type instruction to the jury before deliberations began. See *Allen v. United States*, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896). When asked if they objected to the instruction that included the language in question on appeal, Reed's two defense attorneys answered "[s]tandard" and "[n]o." Reed appears to concede that neither of these responses can be construed as a valid objection to the referenced instruction because he applies a clearly erroneous standard to support his argument.

When a party does not object to an instruction given at trial, this court applies a clearly erroneous standard of review. See K.S.A. 22-3414(3). Instructions are clearly erroneous only if the reviewing court is firmly convinced there is a real possibility the jury would have rendered a different verdict if the trial error had not occurred. *State v. Carter*, 284 Kan. 312, 330, 160 P.3d 457 (2007).

Instruction No. 11 includes the sentence: "Another trial would be a burden on both sides." The instruction is based on PIK Crim. 3d 68.12 (2005 Supp.). The current version of this pattern instruction removes the language "[a]nother trial would be a burden on both sides." See PIK Crim. 3d 68.12 (2009 Supp.). Other than including the now-omitted language, the instruction given to the jury in this case is almost identical to the current version of PIK Crim. 3d 68.12.

The language that "[a]nother trial would be a burden on both sides" was omitted from the pattern instruction after our Supreme Court held in *State v. Salts*, 288 Kan. 263, 266, 200 P.3d 464 (2009), that instructing the jury using this language is error because it is misleading and inaccurate. The *Salts* decision was filed after

the jury was instructed in this case. The *Salts* court determined that even though the instruction was erroneous, the error was not reversible. The instruction was given before the jury deliberated and was included with all the other jury instructions. The defendant did not object to the instruction. Under these facts, the *Salts* court determined there was no real possibility that the jury would have returned a different verdict if the error had not occurred. 288 Kan. at 264-67; see *State v. Ellmaker*, 289 Kan. 1132, 1146-47, 221 P.3d 1105 (2009) (finding instruction with same language was not clearly erroneous because evidence against defendant was substantial); *cf. State v. Page*, 41 Kan. App. 2d 584, 586-87, 203 P.3d 1277 (2009) (giving of instruction reversible error when defense counsel specifically objected to instruction and jury informed district court that hung jury was real possibility).

Reed argues there is a real possibility the jury would have rendered a different verdict if the erroneous instruction had not been given because the evidence against him was not convincing. Nevertheless, the instruction Reed complains about was given before the jury deliberated and was included with all the other jury instructions. Although after deliberations began the jury asked the court questions and requested a read-back of certain testimony, the jury never indicated it was possibly deadlocked, and it reached its verdict the same day the case was given to it for deliberation. The district court polled the jury, and each juror stated he or she agreed with the verdict. While the evidence of Reed's guilt may not have been overwhelming, there was substantial evidence supporting the jury's verdict. Reed has failed to show a real possibility the jury would have rendered a different verdict if the trial error had not occurred. Accordingly, the district court did not commit reversible error in giving this instruction.

Affirmed.

\* \* \*

Buser, J., concurring: I concur with this decision but write separately because, unlike Judge Standridge, I believe the show-up identification used in this case was not unnecessarily suggestive.

At the outset, I disagree that the trial court ruled the show-up identification was unnecessarily suggestive. I base my conclusion on the trial judge's holding at the end of the suppression hearing: "[t]he Court finds that [the eyewitness identification] is not so unnecessarily suggestive or that the identification was so indefinite that suppression would be warranted in this case, so I will deny the motion to suppress the identification." Notably, in their appellate briefing, both the State and Reed argue their respective legal positions with the understanding that the trial court held the show-up identification was not unnecessarily suggestive or unreliable. This is also my understanding of the trial court's finding with regard to the suggestiveness of the show-up identification procedure.

In explaining her independent legal conclusion that the show-up was unnecessarily suggestive, my colleague states: "The record contains no facts to explain why Orabuena was requested to identify Reed at the mall under these suggestive circumstances instead of at the police station, where the identification undoubtedly could have proceeded under less suggestive circumstances." 45 Kan. App. 2d at 381. I disagree with this rationale. This statement suggests the State had a burden to prove why a less suggestive identification procedure was not used in this case.

My colleague's approach fits the standard typically applied to suppression motions generally, where a defendant is "urging the exclusion of evidence deriving from a constitutional violation." See *Manson v. Brathwaite*, 432 U.S. 98, 113 n.13, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977). If the State conducts a warrantless search and is "seeking to invoke [an] exception" to the warrant requirement, for example, it bears the burden of proof on the applicability of that exception. See *State v. Schur*, 217 Kan. 741, 743, 538 P.2d 689 (1975).

In this case, however, "a suggestive preindictment identification procedure does not in itself intrude upon a constitutionally protected interest." *Manson*, 432 U.S. at 113 n.13. The rule articulated in *Stovall v. Denno*, 388 U.S. 293, 301-02, 87 S. Ct. 1967, 18 L. Ed. 2d 1199 (1967), protects "an *evidentiary* interest and, at the same time . . . recognize[es] the limited extent of that interest in

our adversary system." *Manson*, 432 U.S. at 113. In that situation the defendant bears the burden to prove an identification was unnecessarily suggestive. See *United States v. Martin*, 391 F.3d 949, 952 (8th Cir. 2004); *United States v. Beverly*, 369 F.3d 516, 538 (6th Cir. 2004); *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir. 2003); *English v. Cody*, 241 F.3d 1279, 1282-83 (10th Cir. 2001); *United States v. Donaldson*, 978 F.2d 381, 385 (7th Cir. 1992); *United States v. Marson*, 408 F.2d 644, 650 (4th Cir. 1968).

Stated another way, the State does not need to prove that alternative means of identification were considered and reasonably ruled out by law enforcement officers. Although Kansas does not follow the "one-step analysis" used in Massachusetts, see *State v. Hunt*, 275 Kan. 811, 815-17, 69 P.3d 571 (2003), I agree with its Supreme Judicial Court that the "question is whether the [identification] procedure used was permissible, not whether an alternative would have been better." *Commonwealth v. Martin*, 447 Mass. 274, 283, 850 N.E.2d 555 (2006). We should not expect judges "to determine in each case the best method of police investigation, a task for which few of us are suited . . . and one that our legal system generally assigns to the executive branch of government." 447 Mass. at 283-84.

Accordingly, where a police officer drove a robbery victim slowly past two suspects "illuminated by police car lights . . . handcuffed and surrounded by law enforcement officers," our Supreme Court did not discuss alternative means of identification. *State v. Alires*, 246 Kan. 635, 636, 792 P.2d 1019 (1990). Rather, our Supreme Court stated: "[W]e have approved one-on-one confrontations shortly after the commission of an offense" and found "nothing unnecessarily suggestive." 246 Kan. at 640-41. I would make a similar finding in the present case.

BUKATY, J., joins in the foregoing concurring opinion.