IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 125,430

STATE OF KANSAS,
*Appellee*,

v.

J.L.J.,
*Appellant.*

SYLLABUS BY THE COURT

1.

Prosecutors generally have wide latitude in crafting their closing arguments, so long as those arguments accurately reflect the evidence presented at trial and accurately state the controlling law. But a prosecutor errs by arguing that it is the jury's job to convict a criminal defendant when the State proves its case beyond a reasonable doubt.

2.

Generally, a defendant need not object at trial to preserve a claim of prosecutorial error for appellate review. But a defendant may not bypass the contemporaneous-objection rule in K.S.A. 60-404 by reframing an evidentiary challenge as prosecutorial error.

3.

The unconstitutional-conditions doctrine states that the government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether. The doctrine has been applied in

1

situations in which the State either forced a criminal defendant to forfeit one constitutional right to exercise another or impaired the exercise of a constitutional right by needlessly penalizing the defendant for asserting that right.

4.

In determining whether a government-imposed choice violates the unconstitutional-conditions doctrine, the threshold inquiry is whether the State's action impairs to an appreciable extent any of the policies behind the rights involved. In conducting this inquiry, it is appropriate to consider both the nature of the impairment and the legitimacy of the State's practice.

Appeal from Leavenworth District Court; GERALD R. KUCKELMAN, judge. Oral argument held February 2, 2024. Opinion filed May 3, 2024. Affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the briefs for appellant.

*Ethan C. Zipf-Sigler*, assistant solicitor general, argued the cause, and *Kris W. Kobach*, attorney general, was with him on the brief for appellee.

The opinion of the court was delivered by

WALL, J.:  J.L.J. opened fire on a car after one of its passengers ripped off J.L.J.'s cousin in a gun sale. A 12-year-old boy riding in the car was killed. The State charged J.L.J. with first-degree felony murder and several other offenses. J.L.J., who was a juvenile at the time of the shooting, was certified for adult prosecution. At trial, J.L.J. testified he was acting in self-defense. The jury rejected J.L.J.'s self-defense claim and convicted him on all charges.

2

On direct appeal to our court, J.L.J. raises several claims of error. First, he argues that numerous prosecutorial errors warrant reversal of his convictions. He claims the prosecutor erred during voir dire by asking potential jurors if they would do their "job" and convict J.L.J. if the State proved his guilt beyond a reasonable doubt. We agree this was error but conclude it was harmless, which means the error did not contribute to or affect the jury's verdict.

J.L.J. also argues the prosecutor misstated the law on self-defense during closing argument. We disagree. The prosecutor was simply explaining that the evidence better aligned with the State's theory that J.L.J. recklessly discharged his firearm into an occupied vehicle than with J.L.J.'s theory of self-defense.

J.L.J. then argues the prosecutor inflamed the prejudices of the jury during closing argument by stating that J.L.J. had not been thinking about his daughter during the shooting. But the prosecutor's argument simply recited a series of questions from J.L.J.'s cross-examination. And J.L.J. failed to lodge a timely and specific objection to these questions to preserve them for appellate review, as required under K.S.A. 60-404. J.L.J. cannot circumvent the contemporaneous-objection rule by repackaging his evidentiary challenge in prosecutorial-error dressing.

Second, J.L.J. argues that the State unconstitutionally pitted his right to prepare for his defense against his right to testify at trial by asking J.L.J. on cross-examination whether he had viewed the State's discovery before taking the witness stand. He claims the State's impeachment violated the unconstitutional-conditions doctrine, which prevents the State from (1) forcing a defendant to surrender one constitutional right to exercise another and (2) needlessly penalizing a defendant for exercising a constitutional right. But, here, J.L.J. exercised both his right to participate in his defense and the right to

3

testify. And the State's impeachment served the legitimate purpose of enhancing the reliability and truth-seeking function of the criminal process. Thus, the State's impeachment did not violate the unconstitutional-conditions doctrine.

Third, J.L.J. argues the combined effect of these alleged trial errors deprived him of a fair trial. And he urges us to reverse his convictions under the cumulative-error doctrine. But we conclude that only one trial error occurred. Thus, the cumulative-error doctrine does not apply.

Finally, J.L.J. argues that the judicial fact-findings made to certify him for adult prosecution increased his potential maximum punishment in violation of *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). But J.L.J. failed to preserve this issue for review by first raising it before the district court. And we decline to invoke an exception to our general preservation rule because we have consistently rejected this *Apprendi* challenge and J.L.J. has not argued why we should depart from the doctrine of stare decisis in this case.

Thus, we affirm J.L.J.'s convictions and sentence.

FACTS AND PROCEDURAL BACKGROUND

On a sunny evening in April 2021, J.L.J. went to Kare Pharmacy in Leavenworth with his cousin, D.N., and friend, Darvon Thomas. They had arranged to purchase a Glock handgun through social media and planned to meet the seller, Brooke Johnson, in the pharmacy's parking lot. Unbeknownst to them, Brooke was attempting to pass a BB gun off as a genuine firearm.

4

The subsequent events were captured by Kare Pharmacy's surveillance camera. The surveillance footage shows the pharmacy's parking lot has two opposing rows of about 10 parking spots each. J.L.J., D.N., and Thomas arrived in Thomas' Dodge Charger. Thomas backed the Charger into a parking spot in the row farthest from the pharmacy and to the left of the camera. A Volkswagen Jetta then pulled into the lot and backed into a parking spot in the row closest to the pharmacy and to the left of the camera. The parking lot's sole exit was to the right of the camera, and the Jetta was one or two spots closer to the exit than the Charger.

The video shows D.N. approaching the Jetta and exchanging some cash for a gun through the front passenger window. After the exchange, D.N. turned to walk back toward the Charger. He then stopped while briefly inspecting the gun in his hand. He turned back to the front passenger window of the Jetta, which had already been rolled up. D.N. later told police that he realized at that moment he had been given a BB gun rather than the promised Glock, and he had turned to say something to the people in the Jetta.

D.N. then continued to walk toward the Charger, crossing in front of the Jetta. The Jetta began to slowly pull out of its parking spot, immediately turning right toward the exit and away from D.N. and the Charger. As the Jetta made its way toward the exit, J.L.J. stepped out of the front passenger seat of the Charger. He pulled out a gun and pointed it at the Jetta, as it moved toward the parking lot exit. J.L.J. fired 12 rounds at the rear of the Jetta. Eleven of those rounds hit the Jetta, and a twelfth round hit a car driving down a nearby street. B.H., a 12-year-old boy who was sitting in the backseat on the passenger side of the Jetta, sustained three gunshot wounds and later died from his injuries.

Several hours after the shooting, police arrested J.L.J. and D.N. at Thomas' house. Thomas' Charger was parked in the backyard. The Charger had no bullet holes or other damage.

During his police interview, J.L.J. initially said someone in the Jetta had shot out one of the Charger's windows, and Thomas instructed J.L.J. to return fire. J.L.J. also told police that Thomas had gotten the Charger's window fixed in the few hours between the shooting and J.L.J.'s arrest. After the interviewing detective told J.L.J. that a child had died, J.L.J. changed his story. He said he was not at the scene, but Thomas had told J.L.J. to take the rap for the real shooter. J.L.J. then said he had a daughter and felt remorseful and asked the detective what he wanted to know. In his third version of the incident, J.L.J. said Thomas handed him a gun before the sale and he gave it back to Thomas after the shooting. J.L.J. said Thomas told him to shoot at the people in the Jetta after they gave D.N. a BB gun.

D.N.'s statement to the police corroborated J.L.J.'s third version of the incident. D.N. said he yelled out to Thomas and J.L.J. that the front passenger of the Jetta had given him a BB gun. He then heard Thomas say something like, "Shoot, they got my money."

While searching the Jetta, police found a silver BB gun on the floorboard of the driver's seat and a black BB gun on the floorboard of the seat where B.H. had been sitting. Photos of the Jetta showed most of the bullets hit the rear windshield, trunk, and back bumper. Investigators concluded most of the shots were fired at the rear of the Jetta.

The State charged J.L.J. with one count of first-degree felony murder, two counts of criminal discharge of a firearm at an occupied vehicle, and one count of criminal possession of a firearm by a convicted felon. J.L.J., who was 17 years old at the time of the shooting, was later certified for adult prosecution.

6

At trial, the driver of the Jetta, S.L., testified Brooke orchestrated the plan to pass the BB gun off as a genuine Glock firearm and sell it to an unsuspecting buyer. S.L. drove Brooke, B.H., and another passenger to Leavenworth in his Jetta to complete the sale. He said the Jetta's windows were tinted and none of the windows were down when they attempted to leave after the sale. He also said no one in the Jetta pointed a gun.

D.N. testified that he was scared during the sale because he did not know the people in the Jetta. He thought they probably had other guns given the nature of the transaction, but he never actually saw anyone in the Jetta point a gun. He said the windows of the Jetta were up when it was leaving the parking lot, and he could not see inside because the windows were dark.

J.L.J. testified in his own defense. He said that after the sale, D.N. started walking back toward the Charger and then stopped with a shocked look on his face. J.L.J. said he saw the Jetta begin to roll slowly towards D.N, and he thought the Jetta was going to hit D.N. J.L.J. thought he had to shoot because he believed the Jetta's driver had a gun and was pointing it out the window.

J.L.J. admitted he had given three different versions of the incident during his police interview and was now presenting a fourth version at trial. He said he lied about the identity of the shooter during his police interview because he was "freaked out" and did not know what to do. He also said he had consumed cocaine at Thomas' house before being picked up by police and was sleepy by the time he was interviewed around 2 a.m. J.L.J. said that before the interview started, the detective told him a 12-year-old girl was killed and that made J.L.J. think of his daughter.

The jury convicted J.L.J. as charged. The district court sentenced J.L.J. to a controlling term of life imprisonment without the possibility of parole for 25 years.

J.L.J. appeals directly to our court. We heard oral argument on February 2, 2024. Jurisdiction is proper. K.S.A. 22-3601(b)(3)-(4) (life sentence and off-grid crimes appeal directly to Supreme Court).

ANALYSIS

I. *The Prosecutor Committed One Error During J.L.J.'s Trial, but the Error Was Harmless*

For his first issue on appeal, J.L.J. asserts the prosecutor committed three errors during his trial. First, he claims the prosecutor erred during voir dire by asking potential jurors if they would do their "job" and convict J.L.J. if the State proved his guilt beyond a reasonable doubt. Second, he claims the prosecutor misstated the law on self-defense during closing argument. Finally, J.L.J. claims the prosecutor inflamed the prejudices of the jury during closing argument by arguing that J.L.J. had not been thinking about his daughter during the shooting. After reviewing our standard of review and relevant legal framework, we address each claim of error in turn.

A. *Standard of Review and Relevant Legal Framework*

The two-step process for reviewing claims of prosecutorial error is well-established:

> "To determine whether prosecutorial error has occurred, the appellate court must decide whether the prosecutorial acts complained of fall outside the wide latitude afforded prosecutors to conduct the State's case and attempt to obtain a conviction in a manner that does not offend the defendant's constitutional right to a fair trial. If error is found, the appellate court must next determine whether the error prejudiced the defendant's due process rights to a fair trial." *State v. Sherman*, 305 Kan. 88, 109, 378 P.3d 1060 (2016).

8

"Prosecutors generally have wide latitude in crafting their closing arguments, so long as those arguments accurately reflect the evidence presented at trial and accurately state the controlling law." *State v. Slusser*, 317 Kan. 174, 185, 527 P.3d 565 (2023). "'In determining whether a particular statement falls outside of the wide latitude given to prosecutors, the court considers the context in which the statement was made, rather than analyzing the statement in isolation.'" *State v. Bodine*, 313 Kan. 378, 406-07, 486 P.3d 551 (2021). And we have applied this same standard when reviewing allegedly erroneous comments made during voir dire. See *State v. Crawford*, 300 Kan. 740, 748, 334 P.3d 311 (2014).

J.L.J. did not object to any of the prosecutor's comments. But we will generally review claims of prosecutorial error based on comments made during voir dire, opening statements, and closing arguments even without a contemporaneous objection. *Bodine*, 313 Kan. at 406.

B. *The Prosecutor Committed Harmless Error by Asking Potential Jurors if They Would Do Their "Job" and Convict J.L.J. if the State Proved His Guilt Beyond a Reasonable Doubt*

J.L.J. first argues the prosecutor erred by asking the potential jurors during voir dire whether they would do their "job." The prosecutor began by asking a potential juror "will you *do your job* and find the defendant guilty if the State proves to you beyond a reasonable doubt that he committed these crimes?" (Emphasis added.) That potential juror responded affirmatively. The prosecutor then posed the same question to several more potential jurors without repeating the question in full:

"[PROSECUTOR]:  Juror 18, same question.

"VENIREMAN 18:  Yes.

9

"[PROSECUTOR]: Juror 17?

"VENIREMAN 17: Yes, sir.

"[PROSECUTOR]: Juror 29, same question."

After discussing Juror 29's experience with gun violence, the prosecutor then asked the entire panel "[i]f picked as a juror, will you *do your job* and find the defendant guilty if the State proves to you beyond a reasonable doubt that he is guilty? . . . If you agree to do this, raise your sign." (Emphasis added.) The prosecutor then had a discussion with the only potential juror not to raise their sign. That juror eventually agreed they would be able to find J.L.J. guilty if the State proved he committed the crime beyond a reasonable doubt.

Later, during closing argument, another prosecutor reminded the jurors that "[w]hen [the other prosecutor] was going through voir dire with you, jury selection, he asked if all the elements were met, could you find guilty [*sic*]. And the response was yes. Let's take a look at those [elements.]" The prosecutor then discussed the elements of the various charged crimes and the evidence supporting those elements. The prosecutor did not repeat the "do your job" language at any point during closing argument.

In *United States v. Young*, 470 U.S. 1, 17-18, 105 S. Ct. 1038, 84 L. Ed. 2d 1 (1985), the United States Supreme Court held a prosecutor erred by urging the jury to "'do its job,'" explaining "that kind of pressure . . . has no place in the administration of criminal justice." See also *United States v. Mandelbaum*, 803 F.2d 42, 44 (1st Cir. 1986) (finding prosecutor errs by urging jury to do its job or duty). And we agree that a prosecutor errs by arguing that it is the jury's "job" to convict a criminal defendant when the State proves its case beyond a reasonable doubt. See *State v. Scott*, 286 Kan. 54, 79-80, 183 P.3d 801 (2008) (disapproving of prosecutors telling the jury to honor its oath

10

and return a guilty verdict, finding such comments akin to those found erroneous in *Young*), *overruled on other grounds by State v. Dunn*, 304 Kan. 773, 375 P.3d 332 (2016). Based on *Young*, the State concedes error. We thus move to the prejudice analysis.

In determining whether prosecutorial error was harmless, we apply the traditional constitutional harmlessness standard under *Chapman v. California*, 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). *Sherman*, 305 Kan. at 109. Under that standard, "prosecutorial error is harmless if the State can demonstrate 'beyond a reasonable doubt that the error complained of will not or did not affect the outcome of the trial in light of the entire record, *i.e.*, where there is no reasonable possibility that the error contributed to the verdict.'" 305 Kan. at 109 (quoting *State v. Ward*, 292 Kan. 541, Syl. ¶ 6, 256 P.3d 801 [2011]).

The State has met its burden to show that the error was harmless. As the State argues, the prosecutor's improper comments here were limited to voir dire. While the prosecutor referred to voir dire in closing argument, he did not repeat the erroneous "do your job" language. Instead, the prosecutor reminded jurors that they had agreed they "could" find J.L.J. guilty if the State proved all the elements of the charged crimes beyond a reasonable doubt. And voir dire was separated from closing arguments by 2 days of trial at which 9 witnesses testified and 114 exhibits were admitted. Finally, the prosecutor made no other comments during closing argument suggesting the jury was obligated to return a guilty verdict.

J.L.J. argues the prosecutor's error was prejudicial under *State v. Holmes*, No. 125,187, 2023 WL 3140004 (Kan. App. 2023) (unpublished opinion). There, the Court of Appeals held that the prosecutor committed a reversible error by telling the jurors that it was their "job" to convict the defendant if the State proved its case. 2023 WL 3140004, at

11

*2-4. But *Holmes* is distinguishable. The prosecutor in *Holmes* instructed the jury to do its "job" both in voir dire and in closing argument at the one-day trial. And that prosecutor made other comments suggesting the jury was obligated to convict the defendant, which compounded the prejudicial effect of the error. 2023 WL 3140004, at *3.

Our conclusion that the prosecutor's error did not prejudice J.L.J.'s right to a fair trial is further bolstered by the compelling evidence of his guilt. See *Sherman*, 305 Kan. at 111 (strength of evidence may secondarily impact harmlessness analysis). As J.L.J. acknowledges, the outcome of this case largely turned on whether the jury believed his testimony that he acted in self-defense. But J.L.J. was already fighting an uphill battle on the credibility front because he gave four different versions of his involvement in the shooting. He gave three versions to investigators during his police interview. And J.L.J.'s story changed yet again at trial when he first claimed that he was acting in self-defense or in defense of D.N.

J.L.J.'s self-defense claim was not only inconsistent with his prior statements to police but also belied by the other evidence. J.L.J. claimed he feared for D.N.'s safety and thought the driver of the Jetta tried to hit D.N. with that vehicle. But D.N. does not appear to be afraid in the video footage. Instead, he casually walks back to the Charger after receiving the BB gun. As D.N. crosses in front of the Jetta on his way back to the Charger, the Jetta begins to slowly pull out of the parking spot. But D.N. and the Jetta are separated by several feet, and D.N. does not need to move out of the way for the Jetta to make a sharp right turn away from the Charger and toward the parking lot's exit.

J.L.J. also testified he saw the driver of the Jetta with a gun. But D.N. testified he never saw the driver of the Jetta with a gun. And the video shows D.N. had a better vantage point, because he was only several feet away from the Jetta while J.L.J. was much farther away. Several witnesses also testified the Jetta had tinted windows. S.L. and

12

D.N. both testified all the Jetta's windows were rolled up when the car left, and D.N. said he could not see inside the Jetta because the windows were dark. Kare Pharmacy's manager, who witnessed the shooting from inside the pharmacy's front windows, also testified she could not see inside the Jetta's tinted windows even though she was only a few feet away. She also said the Jetta's driver's window stayed up during the entire transaction.

Furthermore, both the surveillance video and ballistics analysis show J.L.J. fired 12 rounds at the rear of the Jetta as it was fleeing the parking lot. Firing a dozen rounds at the rear of a fleeing vehicle is more consistent with the State's theory of criminal discharge of a firearm than with J.L.J.'s theory of self-defense. Thus, while the prosecutor erred by asking potential jurors during voir dire if they would do their "job" and convict J.L.J., the State has met its burden to show there is no reasonable possibility that the error contributed to the verdict.

## C. *The Prosecutor Did Not Misstate the Law on Self-Defense*

Next, J.L.J. argues the prosecutor misstated the law on self-defense during closing argument. At J.L.J.'s trial, the district court gave the jury a self-defense instruction based on PIK Crim. 4th 52.200 (2021 Supp.), which told the jury:

> "Defendant is permitted to use against another person physical force that is likely to cause death or great bodily harm only when and to the extent that it appears to him and he reasonably believes such force is necessary to prevent death or great bodily harm to himself or someone else from the other person's imminent use of unlawful force. *Reasonable belief requires both a belief by defendant and the existence of facts that would persuade a reasonable person to that belief.*" (Emphasis added.)

During closing argument, defense counsel recited part of this instruction: "'Reasonable belief requires both a belief by the defendant . . . and the existence of facts

13

which would persuade a reasonable person to belie[ve] that [the use of deadly force was necessary].'" And during rebuttal, the prosecutor repeated the same portion of the instruction and argued the evidence did not support J.L.J.'s claim that he justifiably acted in self-defense:

> "It's not [B.H.'s] fault he was shot in the back and killed. [J.L.J.] pulled the trigger, killing [B.H.], not caring who else may have been hit. It was reckless. Shouldn't have had the gun in the first place.

> "Defense says that reasonable belief requires both a belief by the defendant and the existence of facts that would persuade a reasonable person to that belief. That's for self defense. *This is no self defense. It's not self defense*. That's shooting in the back of a car driving away. Window's up. No evidence anybody was waving guns around. *Surely no evidence* [*B.H.*] *on the back passenger side was doing anything*." (Emphasis added.)

J.L.J. challenges the portion of the prosecutor's comments emphasized above. First, he argues the State incorrectly suggested the definition of self-defense provided by the jury instructions and defense counsel was incorrect. Second, he argues the State improperly suggested J.L.J. could not claim self-defense because B.H. was an innocent bystander.

A prosecutor may not misstate law applicable to the evidence. *State v. Hilt*, 307 Kan. 112, 124, 406 P.3d 905 (2017). K.S.A. 21-5222 sets forth a two-part test for determining whether an individual justifiably used deadly force in self-defense or in defense of another. The first part is subjective and requires a showing that the defendant "'sincerely and honestly believed it was necessary to kill to defend'" themselves or others. *State v. Qualls*, 309 Kan. 553, 557, 439 P.3d 301 (2019). The second part is objective and "'requires a showing that a reasonable person in [the defendant's] circumstances would have perceived the use of deadly force in self-defense as necessary. [Citation omitted.]'" 309 Kan. at 557.

14

J.L.J. first argues that by stating, "This is no self defense. It's not self defense," the prosecutor implied that defense counsel's definition of self-defense was incorrect, even though it was accurately recited from the jury instruction. But context makes clear the prosecutor was not arguing that defense counsel had incorrectly defined self-defense. See *Bodine*, 313 Kan. at 406-07 (courts consider challenged comment in context rather than in isolation). Instead, the prosecutor was arguing the facts did not support J.L.J.'s theory that he had acted in self-defense. This falls within the bounds of proper argument.

Next, J.L.J. argues the prosecutor erred when he stated that there was "no evidence [B.H.] on the back passenger side was doing anything." J.L.J. admits this statement accurately reflects the evidence presented at trial. Nevertheless, he claims that by highlighting this fact, the State effectively told the jury that J.L.J.'s claim of self-defense would not or should not apply because B.H. was an innocent bystander. J.L.J. acknowledges that in *State v. Betts*, 316 Kan. 191, 207, 514 P.3d 341 (2022), we held that statutory self-defense immunity does not apply to "reckless conduct injuring an innocent bystander who was not reasonably perceived as an attacker." And J.L.J.'s felony-murder charge was based on the inherently dangerous felony of criminal discharge of a firearm at an occupied vehicle, which is a reckless crime. See K.S.A. 2020 Supp. 21-6308(a)(1)(B). But J.L.J. argues *Betts* should not apply here because B.H. was a "nearby cohort[] of the aggressor," not an "innocent bystander."

We note that *Betts* did not involve a criminal defendant's claim of self-defense at trial for a reckless crime. Rather, *Betts* addressed whether a defendant could claim immunity from prosecution under our self-defense immunity statute, K.S.A. 21-5231, for reckless conduct injuring an innocent bystander. We have not addressed whether *Betts* applies outside of that specific context. But we need not decide that issue today because J.L.J.'s argument is based on a misinterpretation of the State's comment.

15

Here, the State was not arguing that, as a matter of law, J.L.J.'s self-defense claim failed because B.H. was an innocent bystander. Instead, the State was arguing that the evidence better supported its theory of prosecution—that J.L.J. killed B.H. while committing criminal discharge of a firearm, a reckless crime—than J.L.J.'s theory of self-defense. The prosecutor's argument that J.L.J.'s behavior appeared reckless rather than intentional was based on the evidence at trial and reasonable inferences drawn from that evidence, and the prosecutor did not misstate the law in making that argument. See *Bodine*, 313 Kan. at 406 (prosecutors have wide latitude in crafting arguments and drawing reasonable inferences from evidence but must not misstate law or evidence). Thus, the prosecutor did not misstate the law on self-defense.

> D. *J.L.J.'s Claim that the Prosecutor Improperly Intended to Inflame the Passions and Prejudices of the Jury Is Actually an Unpreserved Evidentiary Challenge*

In his final prosecutorial-error claim, J.L.J. argues the prosecutor tried to inflame the passions and prejudices of the jury during closing argument by asking whether J.L.J. was thinking about his daughter during the shooting. Ultimately, we conclude that J.L.J.'s argument is more properly characterized as an unpreserved claim of evidentiary error for which K.S.A. 60-404 precludes review.

During his direct examination, J.L.J. testified that before his police interview began, the detective told him a 12-year-old girl had died. J.L.J. said this made him think about his daughter. During cross-examination, the prosecutor pursued a line of questioning to impeach this testimony. The prosecutor asked if J.L.J. was thinking about his daughter during and after the shooting, and J.L.J. admitted he was not:

"Q.    Now, you said that when you were talking to Detective St. John, you were thinking about your daughter?

"A.    Yes, sir.

"Q.    You weren't thinking about your daughter when you were putting round after round into that car; were you?

"A.    No, sir.

"Q.    You weren't thinking about your daughter when you were using drugs; were you?

"A.    No, sir.

"Q.    You weren't thinking about your daughter when you were at the [K]are Pharmacy to buy a gun; were you?

"A.    No, sir."

J.L.J. did not object to any of the prosecutor's questions during this portion of cross-examination.

Later, during the rebuttal portion of closing argument, the prosecutor reminded the jury that J.L.J. had testified he was thinking about his daughter while he was being questioned by police. The prosecutor then restated a series of questions that were substantively similar to those posed to J.L.J. during cross-examination:

"At one point [J.L.J.] testified that when he was being questioned by . . . Detective St. John, he thought about—at the time St. John told him it was a girl that was killed, and he thought about his daughter. Was he thinking about his daughter when he was holding a Glock 45 to watch over a gun deal in the parking lot in Leavenworth

17

County[?] Was he thinking about his daughter when he shot 12 rounds in the back of a fleeing car[?] Was he thinking about his daughter when he went back to Darvon's house where he did some cocaine? Was he thinking about his daughter when he told multiple versions of what happened[?] Was he thinking about his daughter when he killed [B.H.]?"

J.L.J. now argues the prosecutor's comments during closing argument were intended to inflame the passions and prejudices of the jury. He claims the thrust of the State's argument was to persuade the jury that J.L.J. was a bad father because he was involved in the gun sale and shooting rather than being with his daughter. And he claims the comments were not relevant to the issue of his guilt and served only to prejudice the jury against him.

Prosecutors may not make statements that inflame the passions or prejudices of the jury or divert the jury from its duty to decide the case based on the evidence and applicable law. *Bodine*, 313 Kan. at 406. And normally, J.L.J. would not need to object to comments made in closing argument to preserve a claim of prosecutorial error for our review. *State v. George*, 311 Kan. 639, 703, 466 P.3d 469 (2020). But we have recognized a distinction between claims arising from a prosecutor's comments made during closing argument and others arising from a prosecutor's cross-examination of a witness. 311 Kan. at 702-03. Claims falling within the second category are, in essence, evidentiary challenges. As such, a defendant must comply with K.S.A. 60-404 by lodging a timely and specific objection to preserve the claim of error for appellate review. A defendant cannot evade K.S.A. 60-404's contemporaneous-objection rule by reframing an unpreserved evidentiary objection as prosecutorial error. 311 Kan. at 703-04.

Here, J.L.J. challenges the portion of closing argument where the prosecutor mainly repeated a series of questions from J.L.J.'s cross-examination. In essence, he contends that these questions were irrelevant and unduly prejudicial. But J.L.J. failed to lodge a contemporaneous objection to these questions and the testimony elicited from

18

them at trial. And the prosecutor simply restated the substance of these cross-examination questions during closing argument. In these circumstances, J.L.J. cannot evade K.S.A. 60-404's mandate by reframing the issue as prosecutorial error.

If the prosecutor had relied on these questions to develop a new or broader argument in closing, then K.S.A. 60-404 may not have precluded review of J.L.J.'s claim. See *State v. Holt*, 300 Kan. 985, 992, 336 P.3d 312 (2014) (prosecutor erred by going beyond reciting the evidence and emphasizing a fact not relevant to proving the charged crimes and significant only as an appeal to sympathy). But that did not happen—the prosecutor merely restated the substance of his cross-examination questions and drew reasonable inferences from them. See *State v. Timley*, 311 Kan. 944, 950, 469 P.3d 54 (2020) (in crafting closing argument, prosecutors may discuss evidence and draw reasonable inferences from that evidence). As such, K.S.A. 60-404 forecloses our review.

II. *The State's Impeachment of J.L.J. Did Not Violate the Unconstitutional-Conditions Doctrine*

Next, J.L.J. argues the district court erred by allowing the prosecutor to impeach him with questions about whether J.L.J. saw the evidence in the case before he testified. He claims that he was exercising his right to participate in his defense when he viewed discovery and, thus, the prosecutor effectively penalized him for exercising that right. He contends the State's impeachment thus violated the unconstitutional-conditions doctrine because it forced him to choose between exercising his right to participate in his defense and exercising his right to testify.

A. *Standard of Review and Relevant Legal Framework*

Generally, a district court's decision to admit or exclude evidence is reviewed for abuse of discretion. *George*, 311 Kan. at 706. When a party claims the district court

19

abused its discretion by basing its decision on an error of law, this court exercises unlimited review. *State v. Ernesti*, 291 Kan. 54, 65, 239 P.3d 40 (2010). Both parties agree that whether the district court permitted the State to pursue a line of questioning that violated J.L.J.'s constitutional rights is a question of law subject to unlimited review. See *State v. Stafford*, 312 Kan. 577, 588, 477 P.3d 1027 (2020) (reviewing de novo claim that evidence was admitted in violation of Sixth Amendment to the United States Constitution).

The unconstitutional-conditions doctrine states that "'government may not grant a benefit on the condition that the beneficiary surrender a constitutional right, even if the government may withhold that benefit altogether.'" *State v. Nguyen*, 285 Kan. 418, 427, 172 P.3d 1165 (2007); see also *Koontz v. St. Johns River Water Management Dist.*, 570 U.S. 595, 604, 133 S. Ct. 2586, 186 L. Ed. 2d 697 (2013) (unconstitutional-conditions doctrine "vindicates the Constitution's enumerated rights by preventing the government from coercing people into giving them up"). The doctrine has been applied in situations in which the State either (1) forced a criminal defendant to forfeit one constitutional right to exercise another, see *Simmons v. United States*, 390 U.S. 377, 394, 88 S. Ct. 967, 19 L. Ed. 2d 1247 (1968), or (2) impaired the exercise of a constitutional right by "needlessly penaliz[ing]" the defendant for asserting that right, see *United States v. Jackson*, 390 U.S. 570, 583, 88 S. Ct. 1209, 20 L. Ed. 2d 138 (1968).

Nevertheless, defendants must often make difficult choices while navigating the criminal justice system. See *McKune v. Lile*, 536 U.S. 24, 41, 122 S. Ct. 1017, 153 L. Ed. 2d 47 (2002) ("The 'criminal process, like the rest of the legal system, is replete with situations requiring the making of difficult judgments as to which course to follow.'"). And "the Constitution does not forbid 'every government-imposed choice in the criminal process that has the effect of discouraging the exercise of constitutional rights.'" *Jenkins v. Anderson*, 447 U.S. 231, 236, 100 S. Ct. 2124, 65 L. Ed. 2d 86 (1980). Instead, the

20

threshold inquiry is whether the State's action """impairs to an appreciable extent any of the policies behind the rights involved.""" 447 U.S. at 236. In conducting this inquiry, it is appropriate to consider both the nature of the impairment and the legitimacy of the State's practice. See 447 U.S. at 236-38.

      B.   *The State's Impeachment Did Not Violate the Unconstitutional-Conditions Doctrine Because Any Burden on the Exercise of J.L.J.'s Constitutional Rights Was Slight and the Impeachment Served a Legitimate Purpose*

During his cross-examination of J.L.J., the prosecutor pursued a line of questioning to establish that J.L.J. had been made aware of the evidence against him before taking the stand. The prosecutor established J.L.J. had seen the surveillance video and all photos admitted into evidence before testifying. The prosecutor then asked, "Before you testified here today, you had an opportunity to read all of the police reports; didn't you?" Defense counsel objected, arguing "[t]he defendant has a right to see all that stuff, Your Honor, so he can't be impeached by his own right." The district court overruled the objection, finding the line of questioning was fair impeachment. The prosecutor then asked questions establishing that J.L.J. had seen the police reports and statements from other witnesses and that he had a good idea what evidence the State would present at trial. J.L.J. contends this impeachment unconstitutionally pitted his right to participate in his defense against his right to testify at trial, violating the unconstitutional-conditions doctrine.

To make his argument, J.L.J. relies on *Simmons*. There, the defendant testified at a hearing on his motion to suppress to establish his standing to assert a Fourth Amendment violation under the United States Constitution. The Government later used this testimony against the defendant at trial. The United States Supreme Court held the defendant's testimony at the suppression hearing should not have been admitted at trial on the issue of defendant's guilt. *Simmons*, 390 U.S. at 394. In those circumstances, the defendant was forced to either give up a potentially valid Fourth Amendment claim or waive his Fifth

21

Amendment privilege against self-incrimination. 390 U.S. at 394. The Court "[found] it intolerable that one constitutional right should have to be surrendered in order to assert another." 390 U.S. at 394.

J.L.J. claims that like the defendant in *Simmons*, he was forced to choose between his constitutional rights. He claims the State's impeachment "forced [him] to choose between his right to participate in the preparation of his defense and not exercising his right to testify lest he be impeached by the evidence he reviewed." He argues he "should not have to sacrifice one right to exercise another" and that "forcing him to make that choice [between those rights] greatly impairs the policy behind both rights." We disagree.

To begin with, we question whether the State's cross-examination, inquiring about J.L.J.'s review of the discovery before testifying, implicated his exercise of a constitutional right. Certainly, defendants have a state and federal constitutional right to present a defense. *State v. Evans*, 275 Kan. 95, 102, 62 P.3d 220 (2003). And defendants have a constitutional right to testify. *Drach v. Bruce*, 281 Kan. 1058, 1066, 136 P.3d 390 (2006). But there is no general constitutional right to discovery. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977). And J.L.J. cites no authority that a defendant represented by counsel has a right to review discovery. Indeed, some authority suggests otherwise. See *State v. Marks*, 297 Kan. 131, 149, 298 P.3d 1102 (2013) (defendant has no right to personal copies of discovery, and court has previously declined to find constitutional violation when defendant claims discovery violation); see also *People v. Krueger*, 296 P.3d 294, 300 (Colo. App. 2012) (criminal defendant who is represented by counsel does not have unqualified right to personally review discovery; counsel's decision whether to provide client with discovery constitutes matter of trial strategy and lies within counsel's discretion).

But assuming, without deciding, that J.L.J. was exercising a constitutional right when he viewed discovery, any purported burden on the exercise of J.L.J.'s constitutional rights was slight. Unlike *Simmons*, the State's impeachment did not force J.L.J. to sacrifice one constitutional right to exercise another. Indeed, J.L.J. exercised both rights by reviewing discovery and testifying at trial.

Furthermore, the State did not "needlessly penalize" J.L.J. for asserting his alleged right to review discovery. See *Jackson*, 390 U.S. at 583. The State has a legitimate interest in conducting impeachment. See *Jenkins*, 447 U.S. at 238 ("In determining whether a constitutional right has been burdened impermissibly, it also is appropriate to consider the legitimacy of the challenged governmental practice."). Impeachment "advances the truth-finding function of the criminal trial" and "may enhance the reliability of the criminal process." 447 U.S. at 238.

The State's impeachment of J.L.J. was tied to this legitimate purpose. During cross-examination, the State established that J.L.J. had given four different versions of the shooting. And it impeached J.L.J. by confirming he had reviewed the State's discovery and knew what evidence the State would likely present at trial. This evidence included the video, which showed D.N. briefly stopping on his way back to the Charger and then crossing in front of the Jetta as the Jetta began exiting its parking spot. This evidence also included the photos from the search of the Jetta, which showed two other BB guns had been in the car. From this evidence and J.L.J.'s prior inconsistent statements, a juror could infer that J.L.J. crafted his trial testimony around the State's evidence. This inference would explain why J.L.J. changed his version of the incident for a fourth time at trial. And the State's impeachment suggested that J.L.J.'s fourth version of the shooting was unreliable.

Other persuasive authorities have recognized that *Simmons* does not prevent the State from using a defendant's inconsistent statements at a suppression hearing to impeach the defendant at a subsequent trial. See, e.g., *United States v. Jaswal*, 47 F.3d 539, 543 (2d Cir. 1995); *United States v. Beltran-Gutierrez*, 19 F.3d 1287, 1290-91 (9th Cir. 1994); *United States v. Quesada-Rosadal*, 685 F.2d 1281, 1283 (11th Cir. 1982); *Commonwealth v. Rivera*, 425 Mass. 633, 637-38, 682 N.E.2d 636 (1997). And in dicta, the United States Supreme Court has said, "'[T]he protective shield of *Simmons* is not to be converted into a license for false representations.'" *United States v. Salvucci*, 448 U.S. 83, 94 n.9, 100 S. Ct. 2547, 65 L. Ed. 2d 619 (1980) (quoting *United States v. Kahan*, 415 U.S. 239, 243, 94 S. Ct. 1179, 39 L. Ed. 2d 297 [1974]). This further supports our conclusion that the State's impeachment was not unconstitutional under *Simmons*.

In sum, the State's impeachment created no significant impairment of J.L.J.'s constitutional rights because he both viewed discovery in preparation for his trial and he testified in his own defense. And the impeachment served the legitimate purpose of enhancing the reliability of the criminal process and its truth-seeking function. Thus, the State did not "needlessly" penalize J.L.J. for exercising his constitutional rights. See *Jackson*, 390 U.S. at 583; see also *State v. Williams*, 213 Vt. 334, 344, 246 A.3d 960 (2020) ("'Practices that enhance the reliability of the criminal process and its truth-seeking function may be permitted, even if a constitutional right is burdened.'"). And J.L.J. has failed to show that the State violated the unconstitutional-conditions doctrine.

III. *The Cumulative-Error Doctrine Does Not Apply*

Next, J.L.J. argues that the cumulative effect of the alleged trial errors deprived him of a fair trial. Under the cumulative-error doctrine, "[t]he effect of separate trial errors may require reversal of a defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial." *State v. Martinez*, 317 Kan. 151, 172, 527 P.3d 531 (2023). But we

24

have identified only one error—the prosecutor asking the potential jurors during voir dire if they would do their "job." And the cumulative error doctrine does not apply to a single trial error. *George*, 311 Kan. at 709-10.

IV. *We Decline to Invoke a Preservation Exception to Reach J.L.J.'s Constitutional Challenge to the Adult Certification Process*

Finally, J.L.J. challenges the constitutionality of the adult certification process. J.L.J. was 17 years old at the time of the shooting, but the district court later certified him for adult prosecution. In the certification order, the district court made several fact-findings supporting its decision to authorize adult prosecution. See K.S.A. 38-2347.

J.L.J. now argues these judicial fact-findings raised his potential punishment in violation of his Sixth Amendment rights under *Apprendi*. 530 U.S. at 490 (other than fact of prior conviction, any fact which increases penalty for crime beyond prescribed statutory maximum must be proved to a jury beyond a reasonable doubt). J.L.J. contends that if he had been adjudicated for felony murder as a juvenile, his punishment could not have extended past his 23rd birthday. See K.S.A. 38-2369(a)(1). But because he was prosecuted as an adult, he was subject to a life sentence. See K.S.A. 21-6806; K.S.A. 21-6620(b)(1). Thus, J.L.J. claims the judicial fact-findings supporting his certification for adult prosecution increased his maximum punishment contrary to *Apprendi*.

J.L.J. admits he did not preserve this argument for review by raising it before the district court. And parties generally may not raise constitutional issues for the first time on appeal. *State v. Frantz*, 316 Kan. 708, 746, 521 P.3d 1113 (2022). But J.L.J. argues his claim meets two recognized exceptions to this general rule because the claim involves only a question of law and consideration of the claim is necessary to prevent the denial of fundamental rights. See *Pierce v. Board of County Commissioners*, 200 Kan. 74, 80-81, 434 P.2d 858 (1967) (identifying exceptions to preservation rule). J.L.J. also notes that

25

we have previously invoked these exceptions to address *Apprendi* challenges first raised on appeal. See, e.g., *State v. Graham*, 273 Kan. 844, 853-54, 46 P.3d 1177 (2002); *State v. Gould*, 271 Kan. 394, 404-05, 23 P.3d 801 (2001).

But here, we see no need to invoke either exception. We have consistently rejected the claim that judicial fact-findings made in support of an adult-certification order violate *Apprendi*. See *State v. Potts*, 304 Kan. 687, 704-07, 374 P.3d 639 (2016); *State v. Tyler*, 286 Kan. 1087, 1095-96, 191 P.3d 306 (2008); *State v. Mays*, 277 Kan. 359, 367-68, 85 P.3d 1208 (2004); *State v. Kunellis*, 276 Kan. 461, 465, 78 P.3d 776 (2003); *State v. Jones*, 273 Kan. 756, 770-78, 47 P.3d 783 (2002). And J.L.J. has not argued why we should depart from the doctrine of stare decisis in this case. See *Crist v. Hunan Palace, Inc.*, 277 Kan. 706, 715, 89 P.3d 573 (2004) (Under doctrine of stare decisis, "'once a point of law has been established by a court, that point of law will generally be followed by the same court and all courts of lower rank in subsequent cases where the same legal issue is raised.'"). Thus, we decline to invoke an exception to our general preservation rule. See *State v. Vonachen*, 312 Kan. 451, 469, 476 P.3d 774 (2020) (declining to invoke preservation exception to address argument that adult certification process violates *Apprendi* for first time on appeal).

The judgment of the district court is affirmed.